2002–NMSC–001

39 P.3d 124

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**William Mark MANN, Defendant–Petitioner.**

No. 26,582.

Supreme Court of New Mexico.

Jan. 11, 2002.

Billy R. Blackburn, John R. Robbenhaar, Albuquerque, NM, for Petitioner.

Patricia A. Madrid, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, NM, for Respondent.

*OPINION*

SERNA, Chief Justice.

{1} Defendant William Mark Mann appeals his conviction for intentional child abuse resulting in death. The Court of Appeals affirmed Defendant's conviction. *State v. Mann*, 2000–NMCA–088, 129 N.M. 600, 11 P.3d 564, *cert. granted*, 129 N.M. 599, 11 P.3d 563 (2000). Defendant argues that he is entitled to a new trial based on juror misconduct during deliberations. We affirm Defendant's conviction.

## I.  Facts and Background

### A.  The Trial

{2} The victim was the six-year-old son of Defendant and Rita Yancher. Yancher had primary custody of the victim, and the victim usually spent every other weekend with Defendant and Patricia St. Jeor Mann, at the time, Defendant's girlfriend. On August 29, 1996, the victim was present at Defendant's house. At about 11:00 p.m., Defendant and Yancher argued during a telephone conversation regarding the victim staying with him through Saturday as well as late child support payments. At approximately 1 a.m., on August 30th, St. Jeor awoke and saw Defendant going to the victim's room to take him to the bathroom. She heard a noise from the victim, followed by a loud crash and a scream. She ran to the bathroom and saw the victim, apparently having a seizure, on the floor with Defendant cushioning his head. St. Jeor called 911 and reported that the victim was injured. She returned to the bathroom and saw the victim on his back with a screwdriver protruding from his chest. St. Jeor testified that the victim was trying to move himself and Defendant was cupping the screwdriver. St. Jeor, a nurse, attempt-

ed to attend the victim, but Defendant punched her in the eye, grabbed her by her hair and by the back of the neck and "slammed" her through the door into the opposite wall. She again called 911, telling them that Defendant attacked her.

{3} Paramedics arrived and saw St Jeor exit the house; she was bleeding from her face and had a swollen eye. A paramedic testified that Defendant growled, refused to let him treat the victim, and told him to leave the house. Upon the arrival of sheriff's deputies, Defendant was separated from the victim, and the victim was taken to the hospital. Medical personnel were unable to revive the child. The paramedics and medical personnel testified that they did not disturb the screwdriver from his chest while performing CPR and other medical treatment.

{4} The victim's cause of death was the stab wound in his chest. Almost the entire screwdriver's blade, approximately four inches, was embedded in his chest; an autopsy revealed that the screwdriver was wedged between the sternum and the second and third ribs. The victim had two wounds in his chest but only one entry wound, indicating that the screwdriver was withdrawn several inches but not fully removed before it was thrust into his chest a second time. A pathologist testified that there was blood in both the right and left chest cavities, indicating that the wounds occurred prior to the victim's death. The pathologist testified that "there [were] two trajectories that emanate from one entrance hole, one stab wound with two trajectories." He concluded that the victim's wounds were "stabbing paths that were created by a stab into the right chest, a partial withdrawal and then a stab into the left chest." The pathologist testified that the screwdriver could not simply move over into the left chest because the vertebral column protrudes into the cavity; thus, the screwdriver had to be withdrawn until it was above the range of the column and then reintroduced. He also testified that cardiopulmonary resuscitation compressions to the chest, as well as other medical interventions performed on the victim, could not have caused the second wound path. There were no other injuries on the front of the victim's head, face, hands, or elbows.

{5} Defendant was also charged with child abuse for a head injury the victim suffered in 1994. The State's pathologist testified regarding the victim's earlier skull fracture. He concluded that the brain injuries he observed were inconsistent with a simple fall from a bar stool as described by Defendant.

{6} Defendant testified that he got up around 1 a.m. and realized that he had not taken the victim to the bathroom, a routine occurrence. He woke up the victim and walked him into the bathroom. Defendant testified that he was standing in the bathroom doorway when he saw the victim trip on a rug, put out his arms and knock the items on the hamper, and then fall to the floor. Defendant testified that he turned the victim over and saw the screwdriver. Defendant said he grabbed the screwdriver to prevent the victim from pulling it out in order to minimize the injuries. Defendant testified that St. Jeor came back in and that he thought that she would try to move him, so he pushed her from him and told her to get away. He testified that he did not remember hurting her.

{7} Defendant presented the testimony of Dr. Alan Watts, a physicist, regarding the possibility of the victim impaling himself on the screwdriver consistent with Defendant's explanation of events. He performed several calculations in the courtroom relating to the angle at which the screwdriver may have landed and the amount of force which the victim's body would have exerted upon it on impact, as well as videotaped and live demonstrations for the jury. The videotape consisted of Dr. Watts performing experiments in which he dropped a metal rod, which simulated the victim's body, and a screwdriver onto the concrete floor of his garage. Dr. Watts analogized how a screwdriver might bounce if it hits a solid object with the randomness of throwing dice. Dr. Watts testified that the occurrence of an impalement such as that described by Defendant has "a relatively small overall probability." He stated that, based on the "probability aspects of this," it would be a "freakish accident." Dr. Watts said that "[i]t is a probabil-

ity calculation" and he offered an example for comparison to "Monte Carlo [codes] because basically you roll the dice."

{8} The State did not present rebuttal testimony, but instead cross-examined Defendant's expert. Dr. Watts conceded that he was unable to explain from his calculations how the second wound path occurred, stating that he had "no way of calculating how the second path could have been caused on the basis of physics." The prosecutor asked if Dr. Watts could calculate "the probability of [Defendant's] explanation of the stab wound." Dr. Watts testified that he did not calculate the probability of impaling oneself on a screwdriver because "the whole issue that [he] was asked to address was can this happen, and the answer is, yes, it can." He said that the probability would be "finite," but "never zero." Dr. Watts testified that if he "were to run every option possible, [he'd] come to the conclusion that on average you won't stab yourself by falling on a screwdriver, but there is nevertheless a finite possibility it can happen."

{9} A jury convicted Defendant of child abuse resulting in death and second degree murder arising from the death of the victim. The jury also convicted Defendant of aggravated assault of a household member, St. Jeor. The jury deadlocked on the child abuse charge stemming from the victim's 1994 head injury.

## B. The Jurors' Statements

{10} Defendant filed a motion for a new trial, arguing that the verdict was tainted by juror misconduct. Defense counsel interviewed several jurors and was told that Juror 7 presented probability calculations to the other members of the jury regarding the chances of a child and a screwdriver falling in such a manner as to result in impalement. Defendant identified several jurors who he believed had information regarding Juror 7.

{11} The trial court decided to conduct in camera interviews on the record with members of the jury to determine if an evidentiary hearing was necessary because the trial court was concerned with the jurors' privacy after videotape of the jury had appeared on television during the trial. The court gave

Defendant the opportunity to name the jurors whom the court should question and gave both Defendant and the State the opportunity to posit any additional question to be asked. Defendant did not request that the trial court interview all members of the jury. The Court interviewed Jurors 4, 6, 7, 9, and 10.

{12} Juror 9 said that Juror 7 wrote "some calculations" on a board in the jury room, and said,

> But, see, I kind of viewed that more as here is a guy that knows numbers, knows mathematics, who knows probabilities. I viewed it as his life experience. You know, much in the same way that relating back to the '94 head injury ... where the one juror ... brought in his life experience. He didn't bring in something, but in effect he did bring in something. He brought in the fact that he had a kid fall out of a tree and had a bad head injury.... [W]e had nurses in there, and the nurses brought in their life experience...."

{13} Juror 4 noted that Juror 7 "didn't say he did any experiments at home" and that "[h]e didn't bring papers" into the jury room, but used the easel in the room. Juror 4 recounted that Juror 7 said, " 'Let's take Dr. Watts' figures.' And you might fly this by that—being an engineer and probably halfway [physicist], he said using his figures, it can't come out the way he said it did." Juror 10 stated that Juror 7 had some "figures that he had thought about and it was explaining his point of view on the testimony of Dr. Watts." Juror 6 stated that "I feel that the particular juror that—the engineer juror, to me that was just his way of venting his feelings and thoughts and emotions during the deliberation."

{14} Juror 7 told the trial court that he did not do any calculations or experiments at home. He contended that he did not dispute or discredit Dr. Watts' testimony but believed that Dr. Watts' testimony consisted of "fine calculations and [he] would agree with the calculations." Juror 7 thought that the testimony did not "[answer] the right question" because he did not accept the "logical tie" between the testimony and Defendant's

story. Juror 7 completed a probability calculation to "verify [his] own gut feeling," beginning with Dr. Watts' calculations which were presented during the trial. He stated that he used his "professional judgment" and a "fairly simple five-step probability" calculation with five events from Defendant's description of the event: first, whether "the screwdriver land[ed] in the correct orientation" or "solid angle" perpendicular to the victim's falling body; second, whether the screwdriver landed with the blade facing up; third, whether the screwdriver separated itself, as it fell, from other items that had been knocked off the hamper; fourth, where it landed on the floor; and fifth, whether its orientation caused the wound path. He recounted, "I simply multiplied the numbers, one over 10 times one over two times 1 over 100 three times, and the number you get is basically five times ten to minus 8 or in what most of us think about, one in a 20 million chance."

{15} The trial court stated,

I conducted several interviews with the jurors in this case. My concern and purpose for doing that was first of all to find out if there was any juror misconduct requiring possibly a full evidentiary hearing as to the merits of the Defendant's motion as to whether that misconduct may have influenced the jury to the extent the Defendant might be entitled to a new trial in this case.

Also, another reason for my interviews with the jurors were to find in my own mind as to whether anything occurred in the jury room that was such that would require that in the interest of justice that I would have to remedy or should remedy what could be characterized as a manifest miscarriage of justice.

{16} The trial court expressed

after the most serious contemplation, I find that there has not been sufficient evidence before this Court to require either a further inquiry into the jury's conduct, nor is there such that would require me in my role as a judge to set aside that verdict. I feel I believe in the jury system. I believe that the jury in this case took the evidence as they saw it in court, made a decision based on their [consciences] and on the evidence presented in court, although some people may feel that they would have come to a different resolution. That is not what our system is about, and for me to place myself in the stead of the jury to overturn that would be, I feel, [betrayal] of everything I believe about our system.

The trial court then denied Defendant's motion. The trial court found that Defendant failed to meet his burden to demonstrate that extraneous information had reached the jury, stating that there was insufficient evidence to require further inquiry into the jury's conduct or to set aside the verdict. A majority of the Court of Appeals affirmed the trial court on the issue of juror misconduct, concluding that the trial court did not abuse its discretion by denying Defendant's motion for a new trial. *Mann*, 2000–NMCA–088, ¶ 109, 129 N.M. 600, 11 P.3d 564.

## II. Discussion

### A. Juror Conduct

#### 1. Standard of Review

■ {17} This Court will not overturn a trial court's denial of a motion for a new trial unless the trial court abused its discretion. *State v. Volpato*, 102 N.M. 383, 385, 696 P.2d 471, 473 (1985) ("The discretion of a trial court is not to be lightly interfered with, and an order denying a motion for a new trial will not be overturned except for an abuse of discretion."); *accord Gonzales v. Surgidev Corp.*, 120 N.M. 133, 148, 899 P.2d 576, 591 (1995) ("It is within a trial court's discretion whether to grant a motion for a new trial based on bailiff misconduct, and we will review that decision only to determine whether the court abused its discretion."). This Court "will not disturb the trial court's denial of a motion for a new trial unless the ruling is arbitrary, capricious or beyond reason." *State v. Litteral*, 110 N.M. 138, 144, 793 P.2d 268, 274 (1990). The Court of Appeals correctly emphasized that "[r]eliance upon this standard reflects not only the important policies implicated by motions for new trial, but also the trial court's unique position in passing upon such questions in the first instance." *Mann*, 2000–NMCA–088, ¶ 67, 129 N.M. 600,

11 P.3d 564 (citation omitted). We agree that the trial court is in the best position to make this judgment. *United States v. Webster*, 750 F.2d 307, 338 (5th Cir.1984) ("We note at the outset that, sitting as we do far from the daily rigors of trial, we are in a particularly inappropriate position from which to judge the effect of a juror's premature expression of an opinion as to guilt on the minds of the other members of the jury panel. That is precisely why we have traditionally left the manner of handling jury misconduct to the sound discretion of the trial judge.").

## 2. Extraneous Prejudicial Information

■ {18} The competency of a juror as a witness is specifically governed by our Rules of Evidence.

> Upon an inquiry into the validity of a verdict ..., a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

Rule 11–606(B) NMRA 2001. Thus, a juror may testify on the very limited circumstance of whether extraneous prejudicial information was improperly before the jury. Otherwise, the rule prohibits a juror from testifying as to any matter or statement made during the course of deliberations or to the juror's mental processes.

■ {19} The party requesting a new trial on the basis that the jury was exposed to extraneous information "must make a preliminary showing that [he or she] has competent evidence that material extraneous to the trial actually reached the jury." *State v. Sena*, 105 N.M. 686, 688, 736 P.2d 491, 493

(1987) (quoting *State v. Doe*, 101 N.M. 363, 366, 683 P.2d 45, 48 (Ct.App.1983)). Thus, Defendant has the burden to show that the extraneous information actually reached the jury. "This burden is not discharged merely by allegation; rather, Defendant must make an affirmative showing that some extraneous influence came to bear on the jury's deliberations." *Mann*, 2000–NMCA–088, ¶ 85, 129 N.M. 600, 11 P.3d 564. Rule 11 606(B) tracks the language of the comparable federal rule. *See Doe*, 101 N.M. at 365, 683 P.2d at 47. "Unauthorized communications to the jury in state courts must be judged by the federal requirements of due process."[1] *State v. Gutierrez*, 78 N.M. 529, 531, 433 P.2d 508, 510 (Ct.App.1967).

■ {20} Although several prior New Mexico cases, as well as some cases from other jurisdictions, do not distinguish jury tampering, juror misconduct, and juror bias, we believe it would provide clarification to do so. While there is bound to be overlap between these categories, we find the distinctions useful to place the issue in the present case into proper context. *See generally Webster*, 750 F.2d at 338 ("[W]e have distinguished between jury panels tainted by outside influence, such as publicity or direct appeals from third parties, and panels on which one or more of the jurors themselves have violated an instruction of the court."). The essence of cases involving juror tampering, misconduct, or bias is whether the circumstance unfairly affected the jury's deliberative process and resulted in an unfair jury. *See United States v. Olano*, 507 U.S. 725, 739, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (discussing the claim of prejudice when the trial court allowed alternates to sit in on deliberations, but instructed them not to participate, concluding, "[t]here may be cases where an intrusion should be presumed prejudicial, but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?" (citations omitted)).

---

1. Defendant does not argue that the New Mexico Constitution provides greater protection, and we

do not address this question.

{21} Jury tampering generally refers to private communications between third persons and jurors. The United States Supreme Court has held that private communication, contact, or direct or indirect tampering with a juror during a trial about the matter pending before it, "if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties" may result in a due process violation. *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *see also Mattox v. United States,* 146 U.S. 140, 150, 13 S.Ct. 50, 36 L.Ed. 917 (1892) ("Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."). In *Mattox,* the bailiff remarked to the jury that the defendant had a prior murder charge. 146 U.S. at 142, 13 S.Ct. 50. In *Remmer,* an unnamed individual remarked to a juror that he could profit from a particular verdict, and the judge, ex parte, requested an investigation. In *Gutierrez,* the Court of Appeals addressed the issue of jury tampering when an individual approached a "juror and told her 'to make a wise decision,' " and relied upon *Remmer.* 78 N.M. at 530–31, 433 P.2d at 509–10. The Court of Appeals relied upon *Gutierrez* in another jury tampering case in which an "informant" told a juror about "a witness who had identified [the respondent] in court only after an initial hesitation." *Doe,* 101 N.M. at 365–66, 683 P.2d at 47–48.

{22} Juror misconduct, on the other hand, includes activity by members of the jury which is inconsistent with the instructions by the court. *See Sena,* 105 N.M. at 688, 736 P.2d at 493 (rejecting the defendant's argument that the defendant's sister saw a juror sleeping during the trial and a juror's remark that he knew the defendant was guilty but not based on evidence presented at trial constituted juror misconduct and supported the defendant's claim that extraneous material reached the jury). Juror misconduct would also include members of the jury making an unauthorized visit to the scene of the crime, or referring to material, such as a dictionary, not in evidence and against the instructions of the trial court. *See, e.g., State v. Melton,* 102 N.M. 120, 122–24, 692 P.2d 45, 47–49 (Ct.App.1984) (concluding that, where the judge instructed the jury that it was not allowed to have a dictionary and a juror later copied a dictionary definition and showed it to the jury, an improper communication occurred but that the presumption of prejudice was rebutted); *United States v. Harber,* 53 F.3d 236, 241 (9th Cir.1995) (concluding that, when a copy of the case agent's report, not admitted into evidence, was in the jury room during deliberations, it resulted in inherent prejudice where it was read and relied upon by the jury).

{23} In *State v. Sacoman,* 107 N.M. 588, 762 P.2d 250 (1988), this Court addressed whether juror remarks constituted extraneous information that prejudiced the defendant. In *Sacoman,* the defendant's work as a busboy was relevant to his alibi; he claimed that he had not punched his time card but had been paid as if he had finished work at the end of his shift. *Id.* at 589, 762 P.2d at 251. One juror described his own personal experience as a busboy, "relating that on many occasions when he wanted to take off work early he would work extra hard ... then leave without punching out." *Id.* at 590, 762 P.2d at 252. Another juror fabricated a story about employment procedures, claiming that a payroll clerk told the juror that if an employee did not clock out, the clerk assumed that the employee worked the full time. *Id.* The *Sacoman* Court summarily concluded that "[t]he defendant's authorities convince us that he is correct in asserting that the juror communications at issue in this case constituted extraneous information." *Id.* at 591, 762 P.2d at 253.

{24} The Court, in *Sacoman,* expressed a rather broad introductory statement: "[c]ommunication of specific knowledge from a particular juror to others involves extraneous information." *Id.* at 590, 762 P.2d at 252. Defendant relies upon this statement as this Court's definition of extraneous information. As discussed further below, this would be a sweeping and far-reaching rule if actually applied. We do not believe this to be a

particularly helpful test in extraneous information cases. Further, a careful review of the authority on which *Sacoman* based its determination leads us to the conclusion that this aspect of the case was questionable. *Sacoman's* out-of-state authority in which jurors had specific knowledge of extrajudicial facts directly related to the litigation before them was inapplicable to the facts in *Sacoman* and is inapplicable in the present case. *See State v. Wisham,* 384 So.2d 385, 387 (La.1980) (concluding that the defendant's right to an impartial jury was violated when jurors saw the defendant's alibi witness arrested for perjury); *People v. Huntley,* 87 A.D.2d 488, 452 N.Y.S.2d 952, 955–56 (1982) (juror falsely claimed to have visited the scene of the crime and corroborated the state's version of events); *State v. Lorenzy,* 59 Wash. 308, 109 P. 1064, 1065–67 (1910) (remanding for a new trial when defendant was convicted of "conniving at the prostitution of his wife" and juror was familiar with a hotel directly at issue in the case as a house of prostitution). Of particular note, *Sacoman* relied heavily on *State v. Thacker,* 95 Nev. 500, 596 P.2d 508, 509 (1979) (per curiam), a larceny case involving two calves, and characterized a juror "as the foreman of a cattle ranch ... who made estimates regarding the weight of the cattle that contradicted the theory of defense." *Sacoman,* 107 N.M. at 591, 762 P.2d at 253. However, the *Sacoman* Court failed to recognize that, in *Thacker,* the juror's ranch was the same ranch where the calves at issue were located. *Thacker,* 596 P.2d at 509. Unlike those cases, the jurors in *Sacoman* and the present case did not have knowledge of extraneous facts directly related to the specific case. The *Sacoman* juror with busboy experience did not inform the jury as to procedures used at the defendant's place of employment; he simply related his own work experiences in that particular field. *Id.* at 590, 762 P.2d at 252. Similarly, the juror who related a false story concocted a description of a different workplace, not the defendant's. *Id.*

{25} *Sacoman* also relied on cases which involve juror bias, *State v. Larue,* 68 Haw. 575, 722 P.2d 1039 (1986) and *Rogers v. State,* 551 S.W.2d 369 (Tex.Crim.App.1977), in which jurors related personal experiences

similar to the victims in the respective cases. Although juror bias may involve juror misconduct, we consider these cases to be clearly distinguishable from *Sacoman* and the present case as well. *Larue* involved a juror who related to the jury an experience similar to the victims in the case before her, of sexual abuse at a young age, to support the victims' ability to recall the event despite their age. *Larue,* 722 P.2d at 1040–42. The Supreme Court of Hawaii based its conclusion that this constituted extraneous prejudicial information on the fact that the juror should have been excluded for cause during voir dire. *Id.* at 1042; *see State v. Furutani,* 76 Hawai'i 172, 873 P.2d 51, 61 (1994) ("Explicit in our ruling in *Larue* was a recognition that the foreperson's childhood experience constituted 'important biographical information relevant to a challenge for cause.' " (quoted authority omitted)). In other words, *Larue* addressed juror bias. If a juror is biased, then the defendant, by definition, suffers prejudice. One juror's bias, even if it does not influence other jurors, jeopardizes the defendant's right to an impartial jury. *See United States v. Humphrey,* 208 F.3d 1190, 1199–1200 (10th Cir.2000) (concluding that a juror's statement that the juror knew of the defendant's reputation in the community as a drug dealer constituted extraneous material; noting that the statement raised questions regarding the truthfulness of the juror during voir dire and of bias against the defendant).

{26} The relationship between voir dire and juror bias demonstrates the distinctions between the juror's actions in *Larue* and the present case. During voir dire, the parties and the court in *Larue* questioned venire members regarding sexual abuse. *Larue,* 722 P.2d at 1041–42. The juror in question did not disclose that she had been sexually assaulted at age three. *Id.* The juror did not necessarily commit misconduct because she apparently did not attempt to deceive the parties during voir dire, but instead simply failed to understand the significance of the events in her past to the case before her. *Id.* Had she properly disclosed her history, the defendant could have successfully challenged her for cause. *Id.* at 1042. In other words, it is more generally accepted that a juror

who has experienced a traumatic event similar to a victim in a criminal case is likely to be unable to be fair and impartial in deciding the defendant's guilt. *Sacoman* does not discuss whether the juror's experience as a busboy was a fact disclosed during voir dire. Had the defendant raised this issue, it most likely would not have resulted in an excusal for cause because a juror's work experience in this context, although similar to an issue at trial, is not considered to affect the ability of that juror to be fair and unbiased. *See generally State v. Sanchez*, 120 N.M. 247, 251–53, 901 P.2d 178, 182–84 (1995) (discussing a claim of juror bias and determining that, absent exceptional circumstances justifying a finding of implied bias, a defendant must demonstrate actual bias). In the present case, this reasoning is even more clear. The fact that Juror 7 had the educational and professional ability to understand and perform calculations such as those conducted by Defendant's expert would clearly not provide a basis for Juror 7's excusal for cause.

{27} We emphasize that the underlying issue in cases involving extraneous information is a defendant's right to a fair and impartial jury. Jury tampering and juror bias present the clearest examples of potentially improper influences upon a jury, while the notion of juror misconduct creates a more difficult extension of the issue. *See United States v. Dutkel*, 192 F.3d 893, 894–96 (9th Cir.1999) ("Jury tampering is a much more serious intrusion into the jury's processes [than juror misconduct] and poses an inherently greater risk to the integrity of the verdict."). Although some forms of misconduct, such as a juror making an unauthorized visit to the scene of a crime, may infringe on a defendant's right to a fair jury, we are cautious and reluctant to apply this reasoning to actions approaching juror deliberations. *Sacoman* appears to have imprudently extended the reasoning of jury tampering or bias cases to a situation in which a juror drew on his past experiences in order to deliberate on the case before him.[2] Although Juror 7's conduct arguably could be labeled

juror misconduct if we applied the broad introductory statement of *Sacoman* that communication of specific knowledge from one juror to the jury involves extraneous information, we take this opportunity to clarify that jurors may properly rely on their background, including professional and educational experience, in order to inform their deliberations. *See Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173, 186 (1993) ("[W]e feel that the proper approach is to prohibit the use of juror affidavits which seek to impeach verdicts due to a juror's intradeliberational statements based on his or her personal knowledge, when that knowledge is not directly related to the litigation at issue."). "Jurors are generally knowledgeable in many areas, and they are entitled to use their common or acquired sense in arriving at a verdict, so long as the knowledge is not imparted to them outside the judicial proceeding in which they sit as jurors. The use of their extrinsic knowledge in the deliberative process does not fall into the category of extrinsic influence." *State v. Anderson*, 748 S.W.2d 201, 205 (Tenn.Crim.App.1985), *overruled on other grounds by State v. Shelton*, 851 S.W.2d 134 (Tenn.1993). We believe this holding is more consistent with the policy articulated in Rule 11–606(B) that a juror may not testify concerning his or her mental processes or the "effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict." Rather, a juror may only "testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention." Rule 11–606(B).

### 3. Juror 7's Conduct

{28} As discussed below, we conclude that Juror 7's statements constituted proper deliberations based upon his professional and educational experience. Defendant argues that Juror 7 injected new evidentiary facts which contradicted defense testimony rather than expressing opinions, views or beliefs about the evidence. We disagree. Defendant concedes that Juror 7

---

2. Unlike the juror with busboy experience, the *Sacoman* juror who related a false story could more accurately be described as a potentially biased juror. *See Sacoman*, 107 N.M. at 592–94, 762 P.2d at 254–56.

began with Dr. Watts' testimony, but he asserts that Juror 7 "added his own testimony of probability and physics." *See Mann*, 2000–NMCA–088, ¶¶ 39, 42, 129 N.M. 600, 11 P.3d 564 (Apodaca, J., dissenting in part) (characterizing the remarks as a "dissertation"). Juror 7, albeit with greater understanding than the average person, was engaging in deliberation of the evidence presented at trial. *See State v. Chamberlain*, 112 N.M. 723, 732, 819 P.2d 673, 682 (1991).

{29} In order to provide expert testimony supporting Defendant's version of events, Dr. Watts described basic physics principles, completed extensive calculations, and performed both in-court and videotaped demonstrations with a screwdriver and other materials. Dr. Watts testified that the occurrence of an accidental impalement consistent with Defendant's theory has "a relatively small overall probability." Dr. Watts testified that, based on the "probability aspects" of this scenario, the victim's accidental impalement would be a "freakish accident." On cross-examination, Dr. Watts testified that he did not calculate the actual probability of impaling oneself on a screwdriver because the specific issue Defendant wished for him to address was whether the scenario *could* possibly happen. However, Dr. Watts *did give* his expert opinion regarding the probability of such an accidental impalement as "finite," but "never zero." Dr. Watts testified that if he "were to run every option possible, [he'd] come to the conclusion that on average you won't stab yourself by falling on a screwdriver, but there is nevertheless a finite possibility it can happen." Dr. Watts analogized how a screwdriver might bounce into position to the randomness of throwing dice; he compared the probability calculation to "Monte Carlo codes" which are "named after the gambling place." Defendant himself placed probability calculations regarding his accidental impalement theory in evidence before the jury.

{30} Juror 7 articulated his own thought process as to what this "finite" probability calculation would be, based on the evidence presented in court and based on Dr. Watts' testimony. *Mann*, 2000–NMCA–088, ¶ 102, 129 N.M. 600, 11 P.3d 564 (concluding that "Juror No. 7's expression of his 'professional opinion' appears to have been nothing more than the expression of his subjective take on the evidence in record"). Juror 7's deliberations properly took their content from the evidence and testimony presented at trial. His calculation, as well as several other jurors' calculations, expressed the probability, introduced into evidence by Defendant, as one in several million. The jury's deliberation was an attempt to review and evaluate Defendant's expert testimony. Juror 9 rejected the conclusion of Defendant's expert, and decided that "Not in a zillion billion years did that happen." Juror 4 estimated the probability of Defendant's accident occurring as "one in 10 million." Defendant concedes that this type of opinion is proper. *See Mann*, 2000–NMCA–088, ¶ 42, 129 N.M. 600, 11 P.3d 564 (Apodoca, dissenting in part) (asserting that Juror 7 "could have stated that, based on his experience, Defendant's theory was virtually impossible"). Juror 7, because of his life experience, occupation, and education, verbalized a similar opinion as other jurors based on evidence and testimony presented at trial in a more complex manner, explaining the basis behind the conclusion that Defendant finds permissible. Concluding that Defendant's theory has a less than one in twenty million chance, rather than Dr. Watts' characterization of a "freak accident," is not a new evidentiary fact. The jury, including Juror 7, carefully considered Defendant's theory but was ultimately persuaded that the State demonstrated that Defendant was guilty beyond a reasonable doubt; thus, the jury performed its duty. *See Chamberlain*, 112 N.M. at 733, 819 P.2d at 683 ("The jury was required to evaluate ... conflicting versions of the truth, and it properly used the evidence before it to perform its duty."). Defendant wishes to be allowed, and in fact, was properly allowed, to present expert physics testimony regarding the ultimate conclusion of the probability of impalement to the jury (possible but extremely unlikely), but now strenuously objects to the jury actually deliberating on this very issue. It would be inordinately bad policy to single out a juror who thoughtfully and conscientiously engaged in deliberation and presented

his conclusion to the jury because he was able to express exactly why he came to that conclusion based on the evidence at trial, rather than more simply state the theory as one in a million.

{31} In *Chamberlain*, 112 N.M. at 731, 819 P.2d at 681, this Court rejected the defendant's argument that the jury's experiment, in which they removed a gun from its holster to compare the noise with a noise on an audiotape, created new or extrinsic evidence, and concluded that the jury's experimentation with properly admitted evidence in a manner not discussed at trial did not constitute "evidence not properly admitted or experimentation based on facts or evidence not properly before the jury." Similarly, Juror 7's calculations were based on testimony and evidence properly admitted at trial. Defendant emphasizes that Juror 7's calculations contradicted those of his expert. We reject this argument. First, Juror 7 said that he in fact agreed with Dr. Watts' calculations. Secondly, as Defendant concedes, the jury is free to reject expert testimony. *Chamberlain*, 112 N.M. at 732, 819 P.2d at 682 ("The jury is not bound by expert opinion."). "Although potential error may occur if an experiment creates a new evidentiary fact outside of the record for the jury, the jury must be allowed latitude to evaluate evidence and to use its experience to deliberate." *Id.* (citations omitted).

{32} "In deciding every case, jurors must necessarily take into consideration their knowledge and impressions founded upon experience in their everyday walks of life, and the fact that these things affect them in reaching their verdict cannot be reversible error, because, indeed, jurors without possessing such knowledge and impressions could not be had." *State v. Dascenzo*, 30 N.M. 34, 37, 226 P. 1099, 1100 (1924). The trial court did not abuse its discretion by denying Defendant's motion for a new trial under New Mexico precedent. Cases from other jurisdictions also support this conclusion. *See, e.g., Wagner v. Doulton*, 112 Cal. App.3d 945, 169 Cal.Rptr. 550, 552–53 (1980) (concluding that an engineer juror's map, drawn based on his understanding of the testimony and used during deliberations, did

not constitute extraneous evidence); *State v. Heitkemper*, 196 Wis.2d 218, 538 N.W.2d 561, 563–64 (App.1995) (concluding that a pharmacist juror's remark that he disbelieved a witness regarding drugs she ingested because the quantities should have knocked her out did not constitute extraneous information). "A juror's common sense and experience, including expertise in particular subjects, is not extrinsic information warranting relief if used during deliberations." *State v. Dickens*, 187 Ariz. 1, 926 P.2d 468, 483 (1996) (en banc) (holding that a mechanic juror's statement that he did not believe the defendant's claim that his truck overheated based on his expertise did not constitute extraneous information).

{33} Remarks made by the jurors in the present case illustrate the problematic application of a broad definition that communication of specific knowledge from a particular juror to others constitutes extraneous prejudicial information. Juror 9 described how another juror discussed that juror's experience with his own child falling from a tree and how that experience related to his understanding of the child abuse charge stemming from the victim's 1994 head injury. Both Juror 9 and Juror 7 mentioned that two jurors who were nurses discussed their opinion regarding the expert medical testimony, based on their educational and professional experience. Finally, Juror 7 described another juror recounting a previous experience in which the juror fell straight forward and sustained an injury to her chin. All of this information was not subject to cross-examination regarding the similarity or dissimilarity to the charges in the present case; it could be considered extraneous under this definition. The examples from the present case illustrate the difficulties inherent in attempting to distinguish extraneous information from permissible deliberation based on life experience. This highlights the importance of allowing our jury system to function without improper interference, and the critical need for this Court to protect open, full, and complete deliberations among members of the jury.

{34} Defendant argues that the Court of Appeals opinion will result in the "dumbing

down" of juries because attorneys will remove individuals such as Juror 7. We disagree. We do not believe that because an individual has particular professional experience or is well-educated one can assume that he or she is biased in favor of any particular party. As discussed above, venire members who express experiences which would affect their ability to be unbiased can be dismissed through cause challenges during voir dire. If either party wishes to remove a member of the venire because of that individual's life experience, or educational or professional background, as a matter of strategy, the party will have to do so with a peremptory challenge. These factors, without more as determined by the trial court, will not provide a basis for challenging such individuals for cause and will not subject a jury verdict to attack. Accepting Defendant's argument that an articulate juror who expresses and explains his or her reasoning based on properly admitted evidence results in extraneous information prejudicing the jury would, we believe, surely result in a chilling effect on jury deliberations. *Mann*, 2000–NMCA–088, ¶ 83, 129 N.M. 600, 11 P.3d 564 ("The analysis we apply today has evolved expressly to safeguard the secrecy of jury deliberations from unwarranted invasion.").

{35} Juror 7 discussed evidence and testimony properly admitted at trial and performed calculations similar to those of Defendant's expert. *See Chamberlain*, 112 N.M. at 733, 819 P.2d at 683 (concluding that "in evaluating the evidence presented, the jury is given latitude to use its judgment, and although no testimony had been elicited on the exact issue, the background information was all properly before the jury"). We conclude that the trial court correctly found that Juror 7 did not bring extraneous prejudicial information to the jury. The trial court did not abuse its discretion or act in an arbitrary or capricious manner. Because Defendant did not meet his burden by showing that extraneous information reached the jury, we need not address the issue of prejudice.

{36} However, we do note that it appears that the United States Supreme Court has distanced itself from the *Remmer* presumption of prejudice upon which New Mexico

courts have relied. *See Olano*, 507 U.S. at 739–40, 113 S.Ct. 1770; *Smith v. Phillips*, 455 U.S. 209, 214–17, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (reversing a grant of habeas corpus where a juror allegedly applied for a job with the prosecutor's office and holding that due process only requires that the trial court hold a hearing to determine the existence of prejudice). This development has also been recognized by other courts. *See United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir.1998) ("We agree that the *Remmer* presumption of prejudice cannot survive *Phillips* and *Olano*. Accordingly, the trial court must first assess the severity of the suspected intrusion; only when the court determines that prejudice is likely should the government be required to prove its absence."); *United States v. Williams–Davis*, 90 F.3d 490, 497 (D.C.Cir.1996) (rejecting *Remmer's* automatic presumption, relying on *Olano*, and concluding that the trial court should "inquire whether any particular intrusion showed enough of a 'likelihood of prejudice' to justify assigning the government a burden of proving harmlessness"); *Webster*, 750 F.2d at 338 ("We are reluctant to adopt a [presumption of prejudice] rule that would unduly bridle the discretion of district judges who, as we are ever mindful, are obviously in a far better position from which to control the flow of trial."). *But see Dutkel*, 192 F.3d at 894–96 (determining that the *Remmer* presumption of prejudice survives *Phillips* and *Olano*, but only for jury tampering cases involving bribery or threats). For purposes of this case, it is unnecessary to reconcile existing New Mexico precedent with this more recent articulation by the Supreme Court.

{37} As a final matter, Defendant argues that his right of confrontation was violated and makes an unsupported argument regarding his right to be present while the trial court questioned the jurors. Because, as we explained above, we conclude that no extrinsic evidence was before the jury, Defendant was not deprived of his right of confrontation. The trial court's in camera interviews were within its discretion. *See Commonwealth v. Fidler*, 377 Mass. 192, 385 N.E.2d 513, 519 (1979) ("[P]ermitting unbridled interviews of jurors could lead to

harassment of jurors, exploitation of jurors' thought processes, and diminished confidence in jury verdicts. A rule requiring post-verdict interviews to be supervised and directed by the judge also prevents the interrogation from exceeding its proper scope." (citations omitted)); *United States v. DiSalvo*, 34 F.3d 1204, 1223 n. 18 (3d Cir.1994) (concluding that the trial court did not err by interviewing some members of the jury in camera in response to a claim of juror misconduct); *Webster*, 750 F.2d at 339 ("Whether we consider the presence of counsel bottomed on the need to rebut a presumption of prejudice or as emanating from the defendant's general right to be present at all stages of the trial, our inquiry is the same: were appellants prejudiced by the in camera nature of the juror interviews? A review of the transcript of the juror interviews belies any claim that appellants were prejudiced by the trial court's refusal to allow them to participate.") (citations omitted). Although Defendant clearly requested that the trial court hold an evidentiary hearing, Defendant does not indicate how he preserved his right to be present at the interview for appellate review; Defendant does not assert that he requested to be present while the trial court questioned the jurors. The United States Supreme Court provides guidance: "We hold that failure by a criminal defendant to invoke his [or her] right to be present under Federal Rule of Criminal Procedure 43 at a conference which he [or she] knows is taking place between the judge and a juror in chambers constitutes a valid waiver of that right." *United States v. Gagnon*, 470 U.S. 522, 529, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). Our rule regarding a defendant's right to be present is similar to the federal rule. *See* Rule 5–612 NMRA 2001 committee commentary (stating that "this rule is almost identical to Rule 43 of the Federal Rules of Criminal Procedure"). Thus, Defendant's failure to invoke any right to be present when the trial court announced that it was going to interview the jurors in camera constituted a valid waiver of that right.

### III. Conclusion

{38} Defendant failed to demonstrate that extrinsic information actually reached the jury. We conclude that the trial court did not abuse its discretion in denying Defendant's motion for a new trial. The trial court acted within its discretion with respect to Defendant's motion for a new trial. A juror may properly rely on his or her education, experience and common sense during deliberations; thorough discussion, informed by expertise and based on evidence at trial, does not constitute extraneous prejudicial information. Under Rule 11–606(B), such information concerning the juror's mental processes is not properly the subject of juror testimony. Thus, we affirm Defendant's conviction.

{39} **IT IS SO ORDERED.**

WE CONCUR: JOSEPH F. BACA, Justice, GENE E. FRANCHINI, Justice, PAMELA B. MINZNER, Justice, and PETRA JIMENEZ MAES, Justice.