This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: September 20, 2018**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                              NO.  S-1-SC-36459

**MICHAEL RODRIGUEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**Cindy M. Mercer, District Judge**

L. Helen Bennett, P.C.
Linda Helen Bennett
Albuquerque, NM

for Appellant


Hector H. Balderas, Attorney General
Meryl Elizabeth Francolini, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**{1}** Defendant Michael Rodriguez was convicted of first-degree murder for killing his girlfriend Mariana Barnes-Lucero contrary to NMSA 1978, Section 30-2-1(A)(1) (1994). Defendant was also convicted of tampering with evidence contrary to NMSA 1978, Section 30-22-5(B)(1) (2003). The district court sentenced Defendant to life in prison plus three years.

**{2}** On direct appeal pursuant to Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA, Defendant raises four issues: (1) the district court abused its discretion when it allowed jail phone calls into evidence that alerted the jury that Defendant was a detainee at the Valencia County Detention Center, (2) the district court abused its discretion when it allowed in pictures of Defendant that showed his tattoos, (3) the district court erred in denying multiple defense motions for mistrial during voir dire, and (4) there was insufficient evidence of deliberate intent to support Defendant's conviction for first-degree murder.

**{3}** We affirm Defendant's convictions. Because Defendant raises no questions of law that New Mexico precedent does not already sufficiently address, we issue this non-precedential decision. *See* Rule 12-405(B)(1) NMRA.

## I.   BACKGROUND

**{4}** At trial, Defendant did not dispute that he took Barnes-Lucero's life on the

2

evening of February 29, 2016, but claimed that at the time of the killing he was mentally ill and intoxicated from drinking alcohol such that he was not capable of forming the deliberate intent required for a first-degree murder conviction. *See* § 30-2-1(A)(1), UJI 14-5110 NMRA. Defendant asked the jury to find him guilty of second-degree murder rather than first-degree murder.

{5}    Defendant went to Bobby McGee's house the morning of Barnes-Lucero's death. After Defendant and McGee worked at a property across the street, McGee bought an eighteen-pack of beer. They returned to McGee's house. McGee drank two beers and he saw Defendant drink "a couple" of beers. Defendant then left McGee's house and returned to his grandmother's house, where he lived. McGee said Defendant took the remaining beer with him when he left.

{6}    Defendant's grandmother, Irma Rodriguez, testified that when Defendant came home sometime between 12:00 p.m. and 1:00 p.m., he sat on the porch and she thought it was "really weird." She smelled alcohol on Defendant, and his eyes looked "glassy, weird." She asked him to do some weeding in the backyard. While Defendant worked in the yard, he was listening to something through headphones. Grandmother said he was screeching and screaming to whatever he was listening to and it made her uneasy and she did not like it. She asked Defendant to take off the

3

headphones and he became upset and "lost it." Defendant kicked a flowerpot and stormed into the house. Grandmother followed him inside and Defendant pushed her. Defendant knocked a hole in the wall, tore down a cable outside, and left. Grandmother called the police because "he was in no shape to be driving. . . . I didn't want him on the streets because . . . he wasn't being himself at that point." Grandmother said that after Defendant left, she found a couple of beer cans where he had been raking and a plastic Walmart bag full of beer cans in her trash, none of which she believed had been there before.

{7}    Defendant went back to McGee's house and told McGee that he had gotten into a fight with his grandmother and needed a place to stay. McGee told Defendant he could spend the night at his house. McGee said Defendant seemed "a little goofy" and was "a little buzzed." They bought more beer, and McGee said he drank one but did not know how much beer Defendant drank. Defendant called Barnes-Lucero and she arrived at McGee's house about fifteen to twenty minutes later. McGee then left to meet his girlfriend and told Defendant and Barnes-Lucero, "You guy[s] have the house to yourselves until I get back."

{8}    When McGee returned home about two hours later, Defendant's car was gone and the lights were out. McGee said the door was open, and he walked inside and saw

Barnes-Lucero lying on the floor. He thought that it was unusual for her to be sleeping at the time and that perhaps she and Defendant were playing a prank on him. McGee went to the bathroom and then returned to the living room, looked closer at Barnes-Lucero's face, and got scared. He saw her eyes were open and "then I saw the neck, and I just left." McGee went to his girlfriend's house. His girlfriend called McGee's grandmother, and his grandmother called the police.

{9}    At around 8:00 p.m. or 9:00 p.m. that night, Defendant had a brief encounter with his sister's ex-boyfriend, Matthew Brennan, at a gas station on Coors Boulevard in Albuquerque. Brennan was with a friend, Colton Ogle, who also testified at trial. Brennan testified that he was pulling up to the gas station when Defendant came up to his car and "seemed really pumped up in an excited manner." Brennan asked Defendant what was going on, and Defendant said, "Just watch the Ten O'clock News." Brennan asked why, and Defendant said, "Just watch it." Brennan said the Defendant did not appear drunk but seemed "[a]mped up. Not a normal, calm state." Brennan noticed deep scratches on Defendant's neck.

{10}    A little after midnight, police found Defendant sitting in his car outside of his grandmother's house. Defendant was removed from the car and taken into custody. State Police Officer Mitchell Bengston interviewed Defendant after reading him his

rights. Officer Bengston noticed fresh scratches on Defendant's neck and upper chest. Defendant told Officer Bengston that he had been drinking the day before and did not remember what happened. About ten minutes into the interview, Officer Bengston asked Defendant if he would submit to a breath test and Defendant agreed. The breath test result was a .02 blood alcohol content (BAC). Officer Bengston testified that it takes about an hour for an average person to lose .02 BAC from their system, so he decided to wait an hour before resuming the interview. After an hour passed, Defendant was tested again and his BAC was .00, so the interview was started again.

{11} Officer Bengston testified that whenever he asked Defendant about Barnes-Lucero he would become distant, his eyes would move rapidly, and he would place his head in his hands and sigh. Officer Bengston asked Defendant about the scratches on his neck, and Defendant said he could have gotten the scratches when he was arrested. Defendant testified that the blood on his socks came from a cut on his knee. Officer Bengston also testified that Defendant raised his pant leg and showed him a scab that was "very obviously completely scabbed over. It was not fresh."

{12} Forensic pathologist Dr. Hannah Kastenbaum testified that Barnes-Lucero was stabbed in the neck ten times with what appeared to be two different blades—six wounds from a double-edged blade and four wounds from a single-edged blade.

Barnes-Lucero also had injuries to the thyroid cartilage and hyoid bone, ligature marks on her neck and mouth, and petechiae in her eyes, all of which indicated that she had been strangled. Ultimately, Dr. Kastenbaum concluded that Barnes-Lucero died from "[s]trangulation and sharp-force injuries of the neck."

{13} Samantha Rynas, a DNA analyst with the Department of Public Safety Forensic Laboratory, testified that blood on Defendant's blue jeans matched Barnes-Lucero's DNA. Rynas also testified that she tested a sample from Barnes-Lucero's fingernails and found it "was consistent with [Defendant] contributing DNA to that sample."

{14} The jury was instructed on first-degree murder, second-degree murder, and tampering with evidence. The jury was also given UJI 14-5110 to consider whether Defendant's mental disease and intoxication may have negated the specific intent element of first-degree murder. The jury found Defendant guilty of first-degree murder and tampering with evidence.

{15} Other facts are developed as necessary for the issues presented below.

**II. DISCUSSION**

**A.      Jail Phone Calls Were Properly Admitted By the District Court**

{16} Over Defendant's objection, the district court admitted into evidence two recordings of telephone conversations—one between Defendant and his mother, the

7

other with his father—which occurred while Defendant was in pre-trial custody at the Valencia County Detention Center.  Defendant contends that the district court erred in admitting the recordings because it raises an inference of guilt and deprives him of the presumption of innocence for the jury to find out that he was in jail.  The district court held that given the circumstances under which the calls were made and their proximity to the murder, their probative value was not substantially outweighed by the danger of unfair prejudice.

{17}    The conversations were recorded three days after Defendant was arrested.  In the first conversation, Defendant's mother asks him if the knives that police found in his car were "all clean," to which Defendant responds, "Yeah, they were all clean . . . but they're going to have a hard time matching it because it's pretty nasty, pretty nasty . . . so they're going to have a hard time matching it. . . . Basically right now all I think they have is my clothes with blood on them."  In the second conversation, Defendant's father asks him, "Do you remember anything?" and Defendant replies, "Fuck, yeah."  His father then asks, "You remember everything?" and Defendant replies, "I know exactly what happened," to which his father responds, "I thought you were too fucking high to remember anything."  Defendant responds, "That's the story."

{18}    We review the admission of evidence under an abuse of discretion standard.

8

*State v. Branch*, 2010-NMSC-042, ¶ 9, 148 N.M. 601, 241 P.3d 602. "Whether there was possible unfair prejudice in admitting evidence is a matter within the trial court's discretion." *State v. Trujillo*, 1981-NMSC-023, ¶ 32, 95 N.M. 535, 624 P.2d 44. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Guerra*, 2012-NMSC-027, ¶ 18, 284 P.3d 1076 (internal quotation marks and citation omitted). Rule 11-403 NMRA provides that "[a] court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." "The purpose of Rule 11-403 is not to guard against any prejudice whatsoever, but only against the danger of unfair prejudice. Evidence is not unfairly prejudicial simply because it inculpates the defendant. Rather, prejudice is considered unfair when it goes only to character or propensity." *State v. Maxwell*, 2016-NMCA-082, ¶ 24, 384 P.3d 116 (emphasis, internal quotation marks, and citation omitted).

{19}     Defendant objected to the admission of the recordings through a motion in limine and a trial objection. Because Defendant brought the issue to the attention of the district court and the court ruled the recordings were admissible, this was sufficient to preserve the issue for appellate review under Rule 12-321(A) NMRA.

{20}     Defendant argues that because every defendant is entitled to a fair and impartial

9

trial, including the presumption of innocence, that included in that presumption of innocence is the physical indicia of innocence. Relying on cases where indicia of innocence refers to the right of a defendant to be tried in front of a jury in a courtroom in appropriate clothing rather than in prison clothing and handcuffs or shackles, Defendant claims that using the jail phone calls violated his right to be presumed innocent. Generally, it would be improper for the prosecution to inform the jury that a defendant is held in custody unless there was some basis for doing so other than implying that the defendant was guilty or a person of bad character. In this case, the recordings were proffered as evidence of Defendant's mental state at the time of the killing and not merely to malign Defendant's character. The prejudicial impact of alerting the jury that Defendant was in jail three days after the crime took place was minimal as it is commonly understood that a person suspected of committing murder may be held in pre-trial custody. Alerting the jury of Defendant's incarceration was not, as Defendant argues, the same as a defendant appearing before the jury in prison clothing or shackles. The district court carefully weighed the prejudicial impact of the evidence with its probative value before admitting the recordings. In making its decision, the district court weighed the probative value of the evidence with its prejudicial effect pursuant to Rule 11-403. The district court's ruling was not contrary

10

to reason and it was not an abuse of discretion to admit the recordings. Accordingly, we affirm the district court's admission of the jail phone calls.

**B.      Photographs of Defendant Showing His Tattoos Were Properly Admitted**

{21}      Defendant next argues that the district court erred in admitting photographs of Defendant which show his tattoos. Defendant contends the photographs "did nothing more than arouse the passions of the jury by portraying [Defendant] in an offensive light, as one of low moral character, based on his physical appearance." The State argues the photos, which show scratches on Defendant's arms, torso, and neck, were telling of a prolonged physical struggle between Defendant and Barnes-Lucero and were thus probative of Defendant's intent.

{22}      "'We review a trial court's exercise of discretion in admitting allegedly prejudicial photographs under an abuse of discretion standard.'" *State v. Saiz*, 2008-NMSC-048, ¶ 53, 144 N.M. 663, 191 P.3d 521 (*abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783). "'A trial court has great discretion in balancing the prejudicial impact of a photograph against its probative value.'" *Id.* ¶ 54 (citation omitted). Defendant preserved the issue through trial objections to the photographs. *See* Rule 12-321.

{23}      State Police Officer Phillip Vargas took the photos of Defendant the day after

11

the murder. Ten of the admitted photos show Defendant's tattoos. At trial, Defendant argued that there was nothing relevant about the tattoos and that they could give the jury a poor impression of Defendant. The State argued that the photos were relevant in that they showed fresh defensive wounds on Defendant and tattoos have become more socially acceptable and the possible prejudice was less than Defendant claimed. The district court did not explain its reasoning for admitting the ten photos but did exclude one photo (State's Exhibit 78) because it apparently showed a tattoo of an upside-down cross with the word "evil" written underneath.

{24}     The photographs that were admitted were relevant in that they show Defendant's body the morning after Barnes-Lucero was found dead. Other than the existence of the tattoos themselves, the prejudice to Defendant is not readily apparent by their designs or form. The majority of tattoos visible in the admitted photographs are relatively small, innocuous designs with no discernable meaning. Only two tattoos have apparent meaning—one is a Christian cross and the other is the word "GOOD" underneath the cross. There is nothing inherently offensive or shocking about these two tattoos. Accordingly, it was not an abuse of discretion by the district court to admit the ten photos in which Defendant's tattoos are visible.

**C.     Defense Motions for Mistrial During Jury Selection**

12

{25} Defendant next argues the district court erroneously denied defense motions for mistrial during jury selection. Defendant claims that because of statements of jurors during jury selection which hinted at the brutality of the crime, the empaneled jury developed a bias against Defendant and he did not receive a fair trial.

{26} This Court reviews the denial of a motion for mistrial for an abuse of discretion. *State v. Torres*, 2012-NMSC-016, ¶ 7, 279 P.3d 740. "The trial court abuses its discretion in ruling on a motion for mistrial if in doing so it acted in an obviously erroneous, arbitrary, or unwarranted manner." *Id.* (internal quotation marks and citation omitted).

{27} The first motion for mistrial came after the prosecutor spoke about the burden of proof and told the jurors they would have to decide whether Defendant is guilty or innocent based only upon the evidence presented in court. The prosecutor then asked if any of the jurors would have a problem with doing that, and a juror stated, "Upon learning that I was called for this, of course, I immediately go to research and inform myself about it. And based upon what I learned of how the victim died, the brutality of it, immediately gave me a sense of—" The prosecutor immediately stopped the juror from saying anything further, and Defendant moved for a mistrial, arguing that the juror had contaminated the jury panel. The district court denied the motion for

13

mistrial, and the juror was later individually examined and ultimately excused for cause.

**{28}** The second motion came after two jurors spoke only minutes later. The first juror said he was a "first responder and firefighter" and had "respond[ed] to this call in [his] rescue district." The prosecutor asked the juror if he would find it difficult to be fair and impartial, and the juror responded "Yes." Immediately after this, a second juror said he was an "Albuquerque firefighter" and his daughter was

> dispatch for Valencia County. So I do hear a lot that goes on there, and I do—I'm pretty much the same as [the other first responder]. I see the aftermath of what happens. I have to respond to the person that's accused as they're trying to get out of it, of being arrested, and the excuses that they use.

Defendant again argued for a mistrial, stating that the panel had become contaminated and would have a preconceived notion of "how outrageous this was." The district court denied the motion for mistrial, and neither juror was selected to serve on the jury.

**{29}** Later that afternoon, the prosecutor asked the panel if anyone would have difficulty sitting in judgment of another person, to which a juror replied, "I heard something else downstairs that has been eating at me since." Then, outside the presence of the jury panel, the juror said, "It's just something that someone had said

14

downstairs in the waiting room where he had sliced her throat. And it's been eating at me since I heard it, and I don't know if I can . . . honestly form a truthful opinion." The juror explained that she overheard the conversation between two jurors while in the waiting room earlier that morning but her eyes were closed, so she did not see who was speaking and did not know if they were still on the panel. The juror went on to say everyone was talking in the waiting room but she was not and she did not think the conversation could be overheard by others. She said that she could not be fair and impartial and was excused. Defendant moved for a mistrial a third time, claiming the harm could not be cured. The district court again denied the motion for mistrial and asked the remaining jurors if they overheard anybody discussing information about the Defendant's case. None of the jurors indicated that they had.

{30}   The district court then asked if anyone had told other jurors anything about the case. One juror raised his hand and was asked to approach the bench. The juror said that he spoke with a friend who was also on the panel and who had worked as a first responder in this case. The juror said that the first responder told him that "it was a mess over there and that the guy had tried to clean up the evidence and that kids were there." The district court determined that it was the same first responder who spoke earlier in the morning and had been dismissed. The juror said that he told another

15

male juror what the first responder had told him. The juror did not believe that the person he told was still on the panel, but was not sure. The juror was excused for cause, and Defendant moved for mistrial a fourth time. The district court denied the motion.

{31} The essential question regarding a claim of jury bias is "whether the circumstance unfairly affected the jury's deliberative process and resulted in an unfair jury." *State v. Mann*, 2002-NMSC-001, ¶ 20, 131 N.M. 459, 39 P.3d 124. A defendant asserting a claim of juror bias "bears the burden to establish that the jury was not fair and impartial, and must demonstrate bias or prejudice on the part of the remaining jurors." *State v. Gallegos*, 2009-NMSC-017, ¶ 22, 146 N.M. 88, 206 P.3d 993.

{32} Defendant offers only a general claim of jury bias but provides no explanation or details, other than the instances discussed above, to support his claim that the empaneled jury was biased and unable to deliberate in a fair and impartial manner. The jurors involved in the above instances were excused from serving, and Defendant does not point to anything in the record to suggest that the empaneled jurors were biased or motivated by partiality in their deliberation or verdict. The voir dire process is designed to ferret out grounds for juror disqualification, and in this case the process

16

worked as it should. The revelation during voir dire that the case was about a "brutal" murder was not so inflammatory given the circumstances of Barnes-Lucero's death which were revealed during trial. The district court took appropriate steps to minimize any prejudicial impact that members of the jury pool may have had on those jurors ultimately chosen to serve. The district court's denial of the motions for mistrial was not erroneous, arbitrary, or unwarranted. Accordingly the district court did not abuse its discretion and we affirm.

**D.      The Evidence Was Sufficient to Convict Defendant of First-Degree Murder**

{33}      Finally, Defendant alleges that there was insufficient evidence to support his conviction for first-degree, premeditated murder. On appeal, "[t]he test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641 (internal quotation marks and citation omitted). "[W]e must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.

17

{34} Given Defendant's concession that he killed Barnes-Lucero, the jury was essentially tasked with deciding whether to convict Defendant of first- or second-degree murder. To convict Defendant of first-degree murder, the jury had to find that Defendant killed Barnes-Lucero and "[t]he killing was with the deliberate intention to take away the life of [Mariana] Barnes-Lucero." Second-degree murder required the jury to find Defendant "knew that his acts created a strong probability of death or great bodily harm to [Mariana] Barnes-Lucero."

{35} "Deliberate" is defined as "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14-201 NMRA. "A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill." *Id.* "A deliberate intention is rarely subject to proof by direct evidence and often must be inferred from the circumstances." *State v. Astorga*, 2015-NMSC-007, ¶ 60, 343 P.3d 1245. Because Defendant raised the issue of his mental incapacity at the time of the killing, the State had the burden of proving Defendant was capable of forming a deliberate intention to take the life of another. *See* UJI 14-5110.

{36} For the following reasons we conclude that the evidence presented was sufficient for the jury to reasonably find that Defendant killed Barnes-Lucero with the

18

deliberate intention to take away her life. First, the evidence regarding the way Barnes-Lucero was killed can be viewed as proof of Defendant's deliberate intention to take away her life. *See State v. Duran*, 2006-NMSC-035, ¶ 8, 140 N.M. 94, 140 P.3d 515 (concluding that "a reasonable jury could have believed [the d]efendant had the deliberate intent to kill the victim by inferring from the physical evidence of a prolonged struggle and multiple stab wounds"). Dr. Kastenbaum testified that Barnes-Lucero was stabbed ten times in the neck, and the wounds indicated that two different blades had been used to cause the stab wounds. Dr. Kastenbaum also said that Barnes-Lucero's heart was still pumping when she was strangled and stabbed. The Defendant had deep scratches on his neck and arms which indicated a physical struggle that lasted for more than a few seconds.

{37}    Second, there was evidence from which the jury could infer that despite drinking beer, Defendant was relatively lucid and capable of deliberate action only hours before and after killing Barnes-Lucero. Defendant drove to McGee's house after arguing with his grandmother, and McGee testified that Defendant was "a little buzzed" when he came back to his house. Defendant called Barnes-Lucero, she went to McGee's house, and the three interacted until McGee left to meet his girlfriend. After killing Barnes-Lucero, Defendant drove to Albuquerque. Brennan and Ogle saw

19

him at a gas station on Coors Boulevard at around 8:00 p.m. or 9:00 p.m. that night. Brennan testified that Defendant told him to "watch the Ten O'clock News" in an excited manner but "didn't seem drunk" and he "couldn't smell anything on his breath." Brennan testified that Defendant "seemed like himself, but he definitely just was an accelerated version of himself." At approximately 4:00 a.m. the following morning, Defendant had a BAC level of .02 when the police gave him a breath test. The jury could have inferred that Defendant was not intoxicated to such a degree that he was incapable of forming the deliberate intention to kill Barnes-Lucero.

{38} Finally, the evidence of the recorded conversation between Defendant and his father is dispositive of his claim that Defendant did not remember anything after he began drinking, as he had told the police. When his father asked Defendant, "Do you remember anything?" Defendant responded, "Fuck, yeah" and then said, "I know exactly what happened." And from the conversation with his mother in which he discusses the knives found in his truck and describes the circumstances as "pretty nasty," the jury could infer that Defendant understood the nature and manner of the crime and did not suffer from a mental impairment at the time that would have hindered his capacity for deliberate intention.

{39} When viewed in the light most favorable to the guilty verdict for first-degree

20

murder, the evidence was sufficient and we affirm Defendant's conviction.

## V.	CONCLUSION

{40}	For the foregoing reasons, we affirm Defendant's convictions of first-degree murder and tampering with evidence.

{41}	**IT IS SO ORDERED.**


_____
**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**


_____
**JUDITH K. NAKAMURA, Chief Justice**


_____
**CHARLES W. DANIELS, Justice**


_____
**BARBARA J. VIGIL, Justice**

_____
**GARY L. CLINGMAN, Justice**