## CLARK HANKINS V. STATE OF NEBRASKA.

FILED MARCH 25, 1927. No. 25209.

1. **Criminal Law:** EMBEZZLEMENT: EVIDENCE: BOOK ACCOUNTS. In a prosecution for embezzlement where the books, records, papers and entries are voluminous and of such a character as to render it difficult for a jury to arrive at a correct conclusion as to amounts, an expert accountant may be allowed to examine them and to testify as to the result of his examination, when such books, records, papers and entries are in the courtroom, subject to inspection by the accused.

2. ———: ———: ———. In the prosecution of a bookkeeper for embezzlement, records for the inspection and keeping of which he is responsible, and which were inspected and went through his hands in the course of his duties, are admissible against him, though not actually made by him. In the circumstances shown by the evidence in this case, this includes the records made on the detail ribbons of the cash register.

3. ———: JURORS: DUTIES. While a juror in a case under consideration may not state to other jurors a fact in relation to the case, known to him, but not in evidence, yet jurors are not mere automatons. They do not shed their experiences of life when deliberating in the jury room and may, when not violating the above principle, use them by way of illustration and argument, applicable to the case, merely to aid their fellow jurors in arriving at a correct verdict. Record examined in the instance complained of and *held* to show no misconduct of the juror.

ERROR to the district court for Buffalo county: BRUNO O. HOSTETLER, JUDGE. *Affirmed.*

*Pratt, Hamer & Beynon,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Harry Silverman, contra.*

Heard before GOSS, C. J., ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

GOSS, C. J.

The plaintiff in error, convicted of embezzlement and duly sentenced to the penitentiary, comes up on 21 assignments of error. These are so grouped in his argument that they

may be classified and treated inclusively under (1) hear-say testimony of a witness who audited the books and papers, (2) misconduct of the jury and of the county attorney, and (3) error in an instruction to the jury.

The trial lasted eight days and the record is voluminous, consisting of more than 1,000 pages of testimony, including more than 1,100 exhibits. A brief outline of the evidence will help to understand the case. Hankins was charged with the embezzlement, on or about January 28, 1925, of $1,000, the personal property of Paul Niemack, his employer, who operated a garage and automobile business in Ravenna, having the agency for one of the most widely known cars and handling all of the things usually incident to such a concern. The business was conducted in two places, located about half a block apart. The sales and service end, that is, the garage, salesroom, repair shop, gasoline and oil station, was located on the west side of the main street. It was here that the business with customers was transacted, sales were made, money taken in and the cash register kept. On the east side of the street an office was maintained where the books and records were kept. Here the defendant worked as chief bookkeeper, and as manager in the owner's absence, from June 14, 1923, to April 2, 1925. With him was employed an assistant who also worked on the books, three different persons assisting him at different periods during his service. At the garage on the west side of the street 10 to 15 men were employed all the time, 23 or 24 different men being so engaged during defendant's employment. Some of these were salesmen and used the cash register which was the initial step in the system of bookkeeping. The records from the register furnished much of the evidence complained of. The register had various keys for the registering of money and for other purposes. It also had levers which could be set in different places for the purpose of showing the nature of the transaction. While the machine was complicated, it was efficient, and the only mistake it ever made was when a cogwheel broke and the register jumped $100. A record is made by the cash reg-

ister upon a long ribbon, or tape of paper, referred to in the evidence as the "detail ribbon." Each day the register also makes a record of the business of the day upon such dial or dials as are used to record the transactions of the day. The bookkeeping system began with the cash register as follows: About 6:00 o'clock each evening the bookkeeper, or his assistant, would go across the street to the cash register, inspect the dials and the ribbon and count the cash. Then the transactions of the day thus discovered would be entered on a printed sheet called a "daily register take-off sheet," from which entries would be made in the books and accounts. One of these sheets to which we are referred (and there are many others in the record) shows items of cash sales, charge sales, total sales for the day, received on account, merchandise returned, gas sales, storage, accessories, parts, tires, and the like. The defendant testified that the cash was counted the following morning and that, if the cash was different from the amount shown by the register, the take-off sheet would be changed to show the amount actually found. A large number of detail ribbons were identified as having been made by the cash register during the course of defendant's employment and the employer testified that they were a part of his system of bookkeeping. They were not offered in evidence, but were in the courtroom subject to inspection; and a witness, who is an expert bookkeeper and accountant, and who made an audit of the books and accounts, testified that he used the conventional books (naming them) and the cash register ribbons, take-off sheets, and all other records in connection with the business. Over objection by the defendant, the auditor was taken through a long examination from day to day covering the whole period of defendant's charge of the books after July 1, 1923, except a period of about 25 days, the records for which could not be located, and his testimony was received showing in detail the shortages in cash. Likewise the auditor testified to his conclusion from his audit of the books and papers that there was a total shortage of cash unaccounted for amounting to $2,261.03. The defendant was charged with

embezzling $1,000.  The jury found him guilty of embezzling $200.

Defendant does not take the position that it is never proper to permit an accountant or expert bookkeeper to testify to the result of his examination of a set of books or accounts.  He concedes it is well settled that within certain limits, or under certain conditions, he may do so.  It is the rule that, in a prosecution for embezzlement where the books, records, papers and entries are voluminous, and of such a character as to render it difficult for a jury to arrive at a correct conclusion as to amounts, an expert accountant may be allowed to examine them, and to testify as to the result of his examination, when such books, records, papers and entries are in the courtroom, subject to inspection by the accused.  *Bauer v. State,* 99 Neb. 747; *Mendel v. Boyd,* 71 Neb. 657; *Bode v. State,* 80 Neb. 74; *Bartley v. State,* 53 Neb. 310.  But he claims that the general rule was departed from in the admission of expert testimony as to what is shown by the detail ribbons, because, he asserts, they were not made by the defendant.

Defendant does not quarrel with the general rule, but his brief strenuously urges that the evidence of the auditor was erroneously received on the ground that detail ribbons are hearsay.  He asserts they are hearsay, because no single witness, testifying to a single item, says of it that it correctly records a single transaction, or, testifying of a single ribbon, says that he operated the cash register which made the figures on that ribbon.  That argument might have efficacy if it applied to a stranger to the ribbons.  But the defendant is not such.  The cash register was under his dominion.  It was a part of the paraphernalia of his office as bookkeeper.  Every salesman who pushed a button to record a sale was acting under his direction as fully as if he were standing at defendant's desk and making the memorandum with pen or pencil.  And when, at the end of the day, the defendant took account of the business of the day, it was the work of but a moment to check over the cash items on the register ribbon and compare them with the

cash on hand. If he then discovered a discrepancy, it could be reconciled, or the attention of his employer and fellow workers called to it. By his system and his conduct, he adopted the detail ribbon as a verity and bound himself by it as fully as if he had pushed the register button himself, or himself had entered on paper with a pen the items there recorded. It is significant that, when the register cogwheel broke and jumped $100, the fact was readily discovered and promptly reported by him to his employer, though, with this exception, which was patent, he is not known to have reported any of the large number of discrepancies between the cash register ribbon and the actual cash he claims to have found in the cash register, although he testifies these discrepancies were frequent. Moreover, the reason why hearsay testimony is not admissible is that one has no opportunity to cross-examine the adverse witness from whom the testimony is sought to be elicited. But these records spoke to defendant day by day as he checked the cash. They made a fixed record of what they said to him. Being properly identified, they were as competent basis for the testimony of the auditor as any other record used by the defendant in his position as bookkeeper. Of course, they were subject to any explanation he might make to the jury concerning them and their verity, and his explanation, like the evidence sought to be deduced by the state from the register record, was for the jury to weigh in connection with the other evidence in the case.

We hold that, in the prosecution of a bookkeeper for embezzlement, records for the inspection and keeping of which he was responsible, and which went through his hands in the course of his duties, are admissible against him, though not actually made by him. The evidence on this phase of the case was properly submitted to the jury on the authority of the cases heretofore cited, supplemented more definitely, on the point just discussed, by the following: *People v. Elder*, 100 Mich. 515; *State v. Clements*, 82 Minn. 434; *Secor v. State*, 118 Wis. 621; *Ruth v. State*, 140 Wis. 373.

In the trial, the prosecution went further, perhaps, than required.  It had the expert accountant go through the accounts item by item and prove the alleged shortages from day to day and then at the conclusion give the total discrepancies claimed to exist in the accounts, resulting in the sum total above stated.  For example, as a type of the evidence complained of, the defendant selects and sets forth in his brief an instance where the witness was allowed to answer that, on September 25, 1923, he found "a discrepancy of $10 in the amount of cash received on Helen Hicks' account, the amount entered being $517.45 and the correct amount as shown by the cash register being $527.45."  This was objected to on the ground that no foundation had been laid for it, but there was no objection that it called for a conclusion and no motion to strike out that part of the answer of the witness that there was "a discrepancy of $10."  The rest of the answer was competent and its foundation was properly laid in the cash register details and in the accounts.

Defendant complains of the county attorney in his cross-examination of witnesses who testified on direct examination to the good reputation of the defendant and to hearing talks and discussions in a store and barber shop relating to the character of the defendant.  Thereupon the county attorney asked them whether in these talks and discussions anything was said about a shortage of the defendant when working in another garage.  No objection was made to the question.  No error, therefore, can be predicated upon it.  Moreover, such cross-examinations of character witnesses are not controlled by statute and cases interpretive thereof, cited by defendant, such as apply where a defendant is questioned as to a previous conviction of a felony.  The cases of that character briefed by defendant would not be applicable here, even if the alleged error had been preserved.

The motion for new trial was supported by affidavits of several jurors willing, as occasionally happens, to impeach their own solemn verdict.  These were overruled by the

trial court. Error is argued in respect to one of these, that of a juror who swore that during the deliberations of the jury one of his cojurors assured him that, from his experiences in the use and operation of cash registers, mistakes could not be made upon the cash register. Jurors are not mere automatons. Some latitude must be left them to present to their fellow jurors their arguments and their reasons for their beliefs based on the evidence. They do not shed their personalities and their experiences of life when they begin their deliberations. The ideal jury in a technical or scientific case would be one whose members are experienced in the particular branch of technique, or science, necessary to be understood in arriving at an ultimate correct conclusion as to the facts presented in that particular trial. It seems the juror complained of would have been correct if he had spoken in such terms of this particular register, for the machine, itself, never made a mistake, so far as the record shows, unless the broken cogwheel incident would be classified as such. The juror in question was not stating a fact known by him in the case on trial, but was, in effect, expressing an opinion based on experiences of his own merely as argument to aid in arriving at a correct verdict. There is no merit in this assignment of error and the trial court was right in overruling it.

Error is attempted to be predicated on a single clause of the court's instruction to the jury on the evidence produced as to the previous honesty and good character of the defendant. The effect of the whole instruction was to leave this evidence to be considered by the jury in connection with all other evidence in the case, with the admonition that if, after consideration of all the evidence in the case, including that bearing on the good reputation of the defendant, the jury entertained a reasonable doubt of the defendant's guilt, it was their duty to acquit him. We do not find that the instruction prejudiced the defendant in the judgment of the jury, nor that it had any tendency to do so.

Strand v. Bankers Life Ins. Co.

For a long, complicated and technical case, this one was tried with evident fairness and with unusual freedom from just criticism. It does not contain reversible error and ought to be, and is,

AFFIRMED.

Note—See Criminal Law, 16 C. J. 615 n. 66, 743 n. 73, 1082 n. 30.