ADAM RAY MEYER, Appellant, *v.* THE STATE OF
NEVADA, Respondent.

No. 36820

December 19, 2003 80 P.3d 447

Becker, J., with whom Shearing, J., and Young, Sr. J.,
agreed, dissented in part.

*Law Office of David R. Houston* and *David R. Houston,* Reno;
*Kenneth E. Lyon III,* Reno, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *Richard A.
Gammick,* District Attorney, and *Terrence P. McCarthy,* Deputy
District Attorney, Washoe County, for Respondent.

Before the Court EN BANC.[1]

# OPINION

By the Court, AGOSTI, C. J.:

Appellant Adam Ray Meyer was sentenced to a minimum term of ten years in Nevada State Prison after a jury convicted him of one count of sexual assault. Meyer alleges several errors on appeal, including juror misconduct.[2] Having considered his assignments of error, we reverse Meyer's sexual assault conviction. We specifically address his arguments regarding juror misconduct in order to clarify the standard of review in cases involving jury tampering or juror misconduct during deliberations.[3]

## FACTS

On October 19, 1999, Meyer's estranged wife Catrina contacted Reno police about serving a temporary protective order (TPO) upon Meyer. Catrina called the police because Meyer damaged her car earlier in the day. After talking with the police, Catrina called Meyer and told him to meet her at Sneakers Bar. Catrina testified that she intended to call the police again to serve the TPO once Meyer arrived at Sneakers. Catrina consumed a considerable amount of alcoholic beverages while waiting for Meyer, and after he arrived, the two drank and talked for a few hours.

At approximately 10:00 p.m., a call was made from Sneakers to the police about a domestic disturbance. Officer Plumb responded and came into contact with Catrina and Meyer. Meyer falsely

---

[1]THE HONORABLE CLIFF YOUNG, Senior Justice, having participated in the oral argument and deliberation of this matter as Justice of the Nevada Supreme Court, was assigned to participate in the determination of this appeal following his retirement. Nev. Const. art. 6, § 19; SCR 10. THE HONORABLE MARK GIBBONS, Justice, did not participate in the decision of this matter.

[2]Meyer also contends his conviction should be overturned due to failure to preserve evidence and/or the insufficiency of the evidence. After reviewing the record on appeal and the briefs filed herein, we conclude that these remaining contentions lack merit.

[3]Other instances of juror misconduct, such as failing to disclose material information during voir dire, are governed by different standards and are not addressed in this opinion.

identified himself as Catrina's boyfriend and gave his name as "Eric" to Officer Plumb. Because Officer Plumb had no knowledge of Catrina's earlier calls regarding domestic violence, he allowed an intoxicated Catrina to leave Sneakers with Meyer.

Just before midnight, Robert Hunt, Catrina's boyfriend, received a call from Meyer. Hunt testified that Meyer was hostile and threatening and asked about Hunt's sexual relationship with Catrina. Hunt indicated Meyer told him that Meyer had his fingers inside of Catrina and Hunt could hear Catrina saying "please don't do this, please stop" over the phone.

As a result of what he heard, Hunt called the police. Officers were dispatched to Catrina's residence. Prior to their arrival, Meyer was contacted at the residence by telephone, however, he hung up and refused to talk to the police. When the police arrived at the residence at approximately 2:00 a.m., no one answered the door. The police broke down the front door and officers found Catrina wrapped in a blanket in her bedroom. She appeared frightened, had blood on her hands, various scratches and bruises over her body, as well as significant injuries to her mouth and lips. Catrina also had a series of little raised bumps all over her scalp. Catrina told officers that she had been forced to leave the bar with Meyer and that he had beaten her and "shoved his hand up her ass." Catrina indicated that Meyer had left the residence before the police arrived. Catrina also gave the police written statements that night.

A sexual assault examination revealed injuries to Catrina's anus consistent with forced digital penetration. Meyer's semen was found in Catrina's vagina. Catrina indicated she couldn't remember vaginal sex with Meyer, but she did not consent to anal penetration.

The police were unable to immediately locate Meyer. He was arrested nine weeks later near the Arizona/Mexico border. Meyer was charged with one count of kidnapping (for forcing Catrina to leave Sneakers with him) and one count of anal sexual assault.

Catrina's grand jury testimony mirrored her oral and written statements to the police. After the grand jury indictment, Catrina spoke to Meyer while he was incarcerated awaiting trial. In April 2000, Catrina contacted defense counsel and indicated that she wished to recant her previous testimony. Catrina now indicated that she was grossly intoxicated on the day of the event, she remembered consenting to vaginal sex, and that she could have consented to anal sex.

At trial, Catrina indicated that she did not remember calling the police from the bar and that she asked Meyer to take her home because she was drunk. She remembered throwing up at some point, but she did not remember any other details, including whether she and Meyer had sex or how she received her numerous injuries.

Catrina denied that she told the officers she was raped and said that even if she did make such a statement, it was a lie. Catrina also suggested that her injuries were the result of falling down while intoxicated and that she bruised easily because she was taking the prescription medicine Accutane. Finally, on cross-examination, Catrina indicated that she and Meyer had previously engaged in rough sex, including anal sex.

In addition to Catrina's testimony and prior statements, the State presented evidence regarding Battered Woman Syndrome, Catrina's 911 calls to police, photographs of her injuries, a videotaped interview that Catrina gave to the police the day after the incident, medical testimony regarding the sexual assault examination and findings, Hunt's testimony about his phone call with Meyer, and the responding officers' observations. The State also presented expert medical testimony from Dr. Ellen Clark, who indicated that Catrina's injuries were consistent with being punched and kicked and were not consistent with falling down due to intoxication. Dr. Clark also indicated that the injuries were not the result of Accutane side effects. On cross-examination, Dr. Clark agreed that someone hitting the toilet bowl while vomiting might cause the lip injury and that bumping into a door jam could have caused a shoulder injury.

Meyer testified and indicated that he went to Sneakers at Catrina's request. She was intoxicated and left with him voluntarily. He admitted that he gave the police false information because he feared that he might be taken to jail. Meyer indicated that falling down and bumping into various items that night caused Catrina's injuries. He admitted to having vaginal intercourse with Catrina and digitally penetrating her anus, however, he stated both acts were consensual. Meyer also disputed Hunt's version of the phone call. Finally, Meyer testified that he was not fleeing the country when he was arrested but was on vacation for seven weeks with his girlfriend, although he admitted that he knew at least two days after the incident that the police were looking for him.

Meyer presented testimony from three experts. Dr. Donald Henrikson indicated that Catrina's injuries were consistent with falling down or bumping into items. He indicated the anal injuries were minor and that the small bumps on Catrina's head could be acne, though they were more likely to have been caused by ''minor blunt force injury.'' Dr. Thomas Turner testified about alcoholism and alcoholic blackouts. He opined that Catrina suffered such a blackout on the night in question and that her statements were probably the result of conversations with othe rather than a true memory of what happened. Finally, Diane Faugno, a registered nurse and sexual assault examiner, testified that Catrina's injuries were inconsistent with being hit and kicked in the head, though the lip injuries were consistent with being hit. Faugno had no opinion

regarding the source of the small bumps on Catrina's head. Faugno indicated she saw nothing in the evidence she reviewed that suggested a violent, nonconsensual sexual assault, but she admitted she could not rule out sexual assault. Meyer's expert witnesses did not attribute Catrina's bruises to the side effects of Accutane.

The State and Meyer produced additional witnesses who presented conflicting evidence about Catrina's appearance, statements, or attitude before and after the incident. Finally, the State introduced evidence of a prior domestic violence incident involving Meyer.

The jury acquitted Meyer of first-degree kidnapping but found him guilty of sexual assault. After speaking with jurors, Meyer filed a motion for a new trial based upon alleged jury misconduct. The district court denied the motion, and Meyer timely filed this appeal from the conviction and the order denying the new trial.

## DISCUSSION

### I.  Standard of review

"Juror misconduct" falls into two categories: (1) conduct by jurors contrary to their instructions or oaths, and (2) attempts by third parties to influence the jury process.[4] The first category includes jurors failing to follow standard admonitions not to discuss the case prior to deliberations, accessing media reports about the case, conducting independent research or investigation, discussing the case with nonjurors, basing their decision on evidence not admitted, discussing sentencing or the defendant's failure to testify, making a decision on the basis of bias or prejudice, and lying during voir dire.[5] It also includes juror incompetence issues such as intoxication.[6] The second category involves attempts to influence the jury's decision through improper contact with jurors, threats, or bribery.[7]

A denial of a motion for a new trial based upon juror misconduct will be upheld absent an abuse of discretion by the district court.[8] Absent clear error, the district court's findings of fact will not be disturbed.[9] However, where the misconduct involves alle-

---

[4]5 Wayne R. LaFave et al., *Criminal Procedure* § 24.9(f), at 601 (2d ed. 1999).

[5]*Id.* at 601-02.

[6]*Id.* at 602.

[7]*Id.*

[8]*U.S. v. Saya,* 247 F.3d 929, 935 (9th Cir. 2001); *Tanksley v. State,* 113 Nev. 997, 1003, 946 P.2d 148, 151 (1997).

[9]*Saya,* 247 F.3d at 935.

gations that the jury was exposed to extrinsic evidence in violation of the Confrontation Clause, de novo review of a trial court's conclusions regarding the prejudicial effect of any misconduct is appropriate.[10]

Nonetheless, "[n]ot every incidence of juror misconduct requires the granting of a motion for [a] new trial."[11] "Each case turns on its own facts, and on the degree and pervasiveness of the prejudicial influence possibly resulting."[12] The district court is vested with broad discretion in resolving allegations of juror misconduct.[13]

## II. *Proving misconduct*

The general rule at common law was that jurors may not impeach their own verdict.[14] However, common law also recognized an exception to that general rule.[15] Where the misconduct involves extrinsic information or contact with the jury, juror affidavits or testimony establishing the fact that the jury received the information or was contacted are permitted. An extraneous influence includes, among other things, publicity or media reports received and discussed among jurors during deliberations, consideration by jurors of extrinsic evidence, and third-party communications with sitting jurors.[16] In contrast, intra-jury or intrinsic influences involve improper discussions among jurors (such as considering a defendant's failure to testify), intimidation or harassment of one juror by another, or other similar situations that are generally not admissible to impeach a verdict.[17]

---

[10]*Id.* at 937.

[11]*Barker v. State,* 95 Nev. 309, 313, 594 P.2d 719, 721 (1979); *see also Tanksley,* 113 Nev. at 1003, 946 P.2d at 151.

[12]*U.S. v. Paneras,* 222 F.3d 406, 411 (7th Cir. 2000) (internal quotation marks and citation omitted).

[13]*Tanksley,* 113 Nev. at 1003, 946 P.2d at 151; *see also U.S. v. Dominguez,* 226 F.3d 1235, 1246 (11th Cir. 2000) (discussing breadth of discretion given to district court judges).

[14]*Vaise v. Delaval,* 99 Eng. Rep. 944 (K.B. 1785).

[15]*See Government of Virgin Islands v. Gereau,* 523 F.2d 140, 149-50 (3d Cir. 1975).

[16]*See, e.g., Saya,* 247 F.3d at 937-38 (discussing jurors' exposure to extraneous information about earlier shooting involving the defendant and his girlfriend); *U.S. v. Lloyd,* 269 F.3d 228, 237-39 (3d Cir. 2001) (discussing jurors' exposure to extraneous influences via third-party contacts and media reports); *U.S. v. Williams-Davis,* 90 F.3d 490, 495-502 (D.C. Cir. 1996) (discussing third-party communications with jurors, juror exposure to extra-judicial information via media reports, and jurors' use of a dictionary).

[17]*See Government of Virgin Islands,* 523 F.2d at 149-50 (noting that intrinsic misconduct is rarely the grounds for a mistrial because such misconduct

The Federal Rules of Evidence recognize this distinction, and the general rule and exception are embodied in Rule 606(b):

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Thus, proof of misconduct must be based on objective facts and not the state of mind or deliberative process of the jury.[18] Juror affidavits that delve into a juror's thought process cannot be used to impeach a jury verdict and must be stricken.[19]

The Nevada Legislature codified the common-law rules regarding admission of jury testimony to impeach a verdict in NRS 50.065. This court, interpreting NRS 50.065, has stated that a motion for a new trial may only be premised upon juror misconduct where such misconduct is readily ascertainable from objective facts and overt conduct without regard to the state of mind and mental processes of any juror.[20]

## III. *Burden of proof*

Before a defendant can prevail on a motion for a new trial based on juror misconduct, the defendant must present admissible evidence sufficient to establish: (1) the occurrence of juror misconduct, and (2) a showing that the misconduct was prejudi-

---

cannot generally be proven without use of inadmissible juror statements). Some courts established additional exceptions to the rule prohibiting juror statements to impeach a verdict in situations involving quotient or racially motivated verdicts. *See* 5 LaFave, *supra* note 4, § 24.9(q), at 608. Neither of these issues are implicated in this opinion.

[18]*Government of Virgin Islands,* 523 F.2d at 148-49.

[19]*Id.*

[20]*See Barker,* 95 Nev. at 312, 594 P.2d at 721 (noting that NRS 50.065 was substantially the same as predecessor to Federal Rule of Evidence 606(b)); *see also Tanner v. United States,* 483 U.S. 107, 121 (1987) (recognizing that Federal Rule of Evidence 606(b) is based on the long-standing "common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences").

cial.[21] Once such a showing is made, the trial court should grant the motion. Prejudice is shown whenever there is a reasonable probability or likelihood that the juror misconduct affected the verdict.[22]

## A. Prejudice

In some cases, an extraneous influence, such as jury tampering, is so egregious that prejudice sufficient to warrant a new trial is presumed.[23] In addition to jury tampering, certain federal circuit courts of appeal have concluded that exposure to any extrinsic influence establishes a reasonable likelihood that the information affected the verdict and prejudice is assumed.[24] In contrast, other circuit courts look to the nature of the extrinsic influence in determining whether the influence presents a particular likelihood of affecting the verdict.[25]

We conclude that a conclusive presumption of prejudice applies only in the most egregious cases of extraneous influence on a juror, such as jury tampering. We reject the position that any extrinsic influence is automatically prejudicial. Instead, we adopt the position of the circuit courts that examine the nature of the extrinsic influence in determining whether such influence is presumptively prejudicial.

[21]*See U.S. v. Kelley,* 140 F.3d 596, 608 (5th Cir. 1998); *U.S. v. Williams-Davis,* 90 F.3d 490, 496-97 (D.C. Cir. 1996).

[22]*Williams-Davis,* 90 F.3d at 496; *People v. Brown,* 399 N.E.2d 51, 53 (N.Y. 1979); *see also U.S. v. Keating,* 147 F.3d 895, 900 (9th Cir. 1998); *U.S. v. Berry,* 64 F.3d 305, 307 (7th Cir. 1995) (reasonable possibility misconduct affected verdict); *State v. Smith,* 573 N.W.2d 14, 18 (Iowa 1997) (reasonable probability misconduct affected verdict).

[23]*Remmer v. United States,* 347 U.S. 227 (1954) *(Remmer I)*; *Remmer v. United States,* 350 U.S. 377 (1956) *(Remmer II)* (holding that jury tampering is presumptively prejudicial).

[24]*See, e.g., Keating,* 147 F.3d at 900-02 (prejudice is presumed in cases involving juror exposure to extrinsic evidence); *see also Kelley,* 140 F.3d at 608 (upon showing that extrinsic factual matter tainted jury deliberations, defendant enjoys rebuttable presumption of prejudice); *Williams-Davis,* 90 F.3d at 495-96 (discussing application of *Remmer* presumption of prejudice in juror misconduct cases).

[25]*See, e.g., Lloyd,* 269 F.3d at 238 (presumption of prejudice in juror misconduct cases is applied only when the extraneous information is of a "considerably serious nature"); *U.S. v. Caldwell,* 83 F.3d 954, 956 (8th Cir. 1996) (presumption of prejudice in juror misconduct cases limited to improper third-party communications regarding the substance of the trial); *Williams-Davis,* 90 F.3d at 497 (presumption of prejudice applies when extraneous influence or information has a likelihood of prejudice); *U.S. v. Boylan,* 898 F.2d 230, 261 (1st Cir. 1990) (presumption of prejudice applies in cases of significant third-party contacts with sitting jurors or those involving aggravated circumstances).

Of course, some types of extrinsic influences are, by their very nature, more likely to be prejudicial. Direct third-party communications with a sitting juror relating to an element of the crime charged or exposure to significant extraneous information concerning the defendant or the charged crime fall into this category.[26] This is because the nature of the extrinsic information alone establishes a reasonable probability that the extrinsic contact affected the verdict.

However, other types of extrinsic material, such as media reports, including television stories or newspaper articles, generally do not raise a presumption of prejudice.[27] Jurors' exposure to extraneous information via independent research or improper experiment is likewise unlikely to raise a presumption of prejudice.[28] In these cases, the extrinsic information must be analyzed in the context of the trial as a whole to determine if there is a reasonable probability that the information affected the verdict.

The same standard applies to cases involving intrinsic jury misconduct. The defendant must, through admissible evidence, demonstrate the nature of the juror misconduct and that there is a reasonable probability that it affected the verdict. Because intrinsic misconduct can rarely be proven without resort to inadmissible juror affidavits that delve into the jury's deliberative process, only in extreme circumstances will intrinsic misconduct justify a new trial.[29]

---

[26]*See, e.g., Remmer I,* 347 U.S. at 229 ("'[A]ny private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . presumptively prejudicial. . . .'"); *U.S. v. Brooks,* 161 F.3d 1240, 1246 (10th Cir. 1998) (presumption of prejudice in juror misconduct cases limited to improper third-party communication or contact about the matter pending before the jury); *U.S. v. Frost,* 125 F.3d 346, 377 (6th Cir. 1997) (presumption of prejudice in juror misconduct cases limited to unauthorized third-party communication with a juror which presents a likelihood of affecting the verdict).

[27]*See, e.g., Lloyd,* 269 F.3d at 239 (stating that presumption of prejudice does not apply in cases involving juror exposure to media reports unless the publicity is fundamentally prejudicial).

[28]*See, e.g., U.S. v. Rogers,* 121 F.3d 12, 17 n.5 (1st Cir. 1997) (noting that juror use of a dictionary is not generally considered prejudicial per se); *Williams-Davis,* 90 F.3d at 502 (presumption of prejudice does not apply where jurors used a diction. `;` *U.S. v. Gillespie,* 61 F.3d 457, 460 (6th Cir. 1995) (prejudice is not automatically presumed if jurors studied a dictionary definition).

[29]*See generally Tanner,* 483 U.S. at 110-26 (discussing intra-jury misconduct); *Dominguez,* 226 F.3d at 1246-47; *Caldwell,* 83 F.3d at 956; *see also U.S. v. Brito,* 136 F.3d 397, 414 (5th Cir. 1998) (noting juror misconduct was the discussion, based on extrinsic evidence, of possible sentences and appeals in contravention of jury instructions).

## B. *Evaluating misconduct*

To determine whether there is a reasonable probability that juror misconduct affected a verdict, a court may consider a number of factors. For example, a court may look at how the material was introduced to the jury (third-party contact, media source, independent research, etc.), the length of time it was discussed by the jury, and the timing of its introduction (beginning, shortly before verdict, after verdict, etc.).[30] Other factors include whether the information was ambiguous, vague, or specific in content; whether it was cumulative of other evidence adduced at trial; whether it involved a material or collateral issue; or whether it involved inadmissible evidence (background of the parties, insurance, prior bad acts, etc.). In addition, a court must consider the extrinsic influence in light of the trial as a whole and the weight of the evidence.[31] These factors are instructive only and not dispositive.[32]

Finally, the district court's factual inquiry is limited to determining the extent to which jurors were exposed to the extrinsic or intrinsic evidence.[33] The district court must apply an objective test in evaluating the impact of the extrinsic material or intrinsic misconduct on the verdict and should not investigate the subjective effects of any extrinsic evidence or misconduct on the jurors.[34] That is, the district court must determine whether the average, hypothetical juror would be influenced by the juror misconduct.[35] Affidavits or statements by jurors about the actual effect of the misconduct on the deliberations or their individual decisions are not admissible to determine the impact of the misconduct upon a verdict. Mindful of these factors, we turn to the record in this case.

## IV. *Admissibility of juror affidavits*

One of the issues at trial involved the source of the small bruises, marks, or bumps on Catrina's scalp. The State argued they were caused by Meyer's violent actions. Meyer contended they were caused by Catrina's medication, Accutane. Meyer filed a motion for a new trial based on juror misconduct involving, in part, this issue. Meyer submitted two juror affidavits and one affidavit from defense investigator Michael Johnson, concerning his conversations with a third juror.

---

[30]*Bayramoglu v. Estelle,* 806 F.2d 880, 887 (9th Cir. 1986); *see also Saya,* 247 F.3d at 937; *Paz v. United States,* 462 F.2d 740, 746 (5th Cir. 1972).

[31]*Jeffries v. Wood,* 114 F.3d 1484, 1491-92 (9th Cir. 1997).

[32]*See Jeffries v. Blodgett,* 5 F.3d 1180, 1190 (9th Cir. 1993).

[33]*See id.* at 1191.

[34]*Dickson v. Sullivan,* 849 F.2d 403, 406 (9th Cir. 1988).

[35]*Lloyd,* 269 F.3d at 238.

The affidavits established that one juror, who worked in a nursing capacity at Washoe Medical Center, opined that the small bumps found on Catrina's scalp were similar to those she had observed in domestic violence hair-pulling situations. In addition, another juror, who was employed in a dermatologist's office, consulted a *Physicians' Desk Reference* (PDR) on the side effects of Accutane and then advised the jury that Accutane only causes easy bruising in one percent of the population. Finally, one of the affidavits indicated that the jury had discussed penalties in its deliberations.

The State opposed the motion and moved to strike portions of the affidavits that violated NRS 50.065. Attached to the State's opposition was an affidavit signed by the juror interviewed by investigator Johnson, who stated that she only consulted the PDR to insure that her memories regarding Accutane were correct.

In a written order denying Meyer's motion for a new trial, the district court struck substantial portions of the juror affidavits, determining those portions to be statements reflecting the juror's mental process and deliberations, rather than statements of objective facts regarding whether jurors reviewed information not admitted into evidence in their deliberations. The deleted portions of the affidavits included references regarding the side effects of the Accutane and the effect that sentencing discussions had on the mental process of two of the jurors.

Meyer contends that the district court erred by striking these portions of the juror affidavits. Meyer argues that the stricken portions of the affidavits were determinative of whether his trial was prejudiced by juror misconduct. We disagree.

The record reveals that the stricken portions of the juror affidavits outline the effect that the alleged misconduct had upon some of the jurors, or how the jury conducted its deliberations. This information involved the jurors' or jury's thought processes. Thus, the district court did not abuse its discretion in striking those portions of the juror affidavits that violated NRS 50.065 and only considering objective facts of extrinsic information in the affidavits. We also note that the district court should not have considered those portions of the juror affidavits relating to the discussion of sentencing as this is also an intrinsic matter that is not subject to the exceptions for jury affidavits incorporated in NRS 50.065 or the rare case where sentencing discussions are accompanied by extrinsic information.[36] Accordingly, we conclude that Meyer's contention regarding the admissibility of the affidavits lacks merit.

[36]*Brito,* 136 F.3d at 414 (holding that the defendant was not entitled to a new trial where jury had general discussion of penalty during deliberations but there was no evidence that jury learned of information from an outside source).

## V. Alleged misconduct—motion for new trial

Meyer alleges that two instances of juror misconduct properly evidenced by the juror affidavits denied him a fair trial: (1) the juror's statement during deliberations that the small bumps on the victim's head could have been caused by hair pulling; and (2) the second juror's independent research on the side effects of Accutane, and her report of the same to the other jurors.[37]

As to the hair-pulling incident, the district court found the juror's actions were not misconduct because she used her everyday experience as a nurse, not extrinsic information, to evaluate Catrina's testimony. We agree.

In reaching their verdict, "jurors are confined to the facts and evidence regularly elicited in the course of the trial proceedings."[38] A juror is prohibited from declaring "to his fellow jurors any fact relating to the case as of his own knowledge."[39] However, jurors may rely on their common sense and experience.[40]

If a juror has personal knowledge of the parties or of the issues involved in the trial that might affect the verdict, the communication of that knowledge to other jurors is considered extrinsic evidence and a form of misconduct.[41] Likewise, if a juror considers and communicates a past personal experience that introduces totally new information about a fact not found in the record or the evidence, this would constitute extrinsic evidence and improper conduct.[42] Personal experiences are to be used only to interpret the exhibits and testimony, not as independent evidence.[43]

Here, the juror's statements are not the product of everyday common experience, that is, an observation based on matters generally experienced by people in their everyday lives. Her statements

---

[37]Meyer also contends that the jury's discussion of possible sentence warrants a new trial. However, as noted above, this is the type of intra-jury or intrinsic misconduct that falls outside the exception on the use of juror affidavits. Since the only evidence of misconduct on this issue is through the use of inadmissible affidavits, Meyer did not meet his burden of establishing misconduct. We therefore decline to consider this issue.

[38]State v. Thacker, 95 Nev. 500, 501, 596 P.2d 508, 509 (1979).

[39]NRS 175.121(1)(a).

[40]U.S. v. Navarro-Garcia, 926 F.2d 818, 821-22 (9th Cir. 1991) (past personal experiences may be an appropriate part of a jury's deliberations).

[41]Hard v. Burlington Northern R.R., 812 F.2d 482, 486 (9th Cir. 1987) (former employee of railroad related his knowledge of railroad practices to other jurors).

[42]Navarro-Garcia, 926 F.2d at 821-22.

[43]United States v. Jones, 580 F.2d 219, 222 (6th Cir. 1978).

are more akin to a form of expert opinion. Analysis of the evidence by a juror with professional expertise does not fall squarely within the prohibitions against considering facts or evidence not in the record. Courts that have considered this issue are split on whether quasi-expert opinion statements by a juror constitute misconduct.

In *People v. Maragh*,[44] the New York Court of Appeals held that the defendant was entitled to a new trial where a nurse expressed her expert opinion on a material issue in the case, and that opinion was distinct from and in addition to the medical evidence introduced at trial. The court noted that recent jury reform measures were designed to eliminate exemptions for professionals and broaden the jury pool. Thus, it was expected that such individuals would bring a certain amount of their professional experience to the deliberative process.[45] Nevertheless, the court held that substituting a juror's professional opinion for that of the experts who testified at trial violates the right of a litigant to have the case decided only upon the evidence adduced at trial.[46] The New York court did note, however, that jurors who are professionals could still use their expertise in arriving at their own decisions regarding credibility or their vote on a verdict.[47] Finally, the court suggested that trial courts modify their standard preliminary instructions so that jurors who are professionals would be advised that they could not use their professional expertise to supplement the record on material issues.[48]

In contrast, the Supreme Court of New Mexico, in *State v. Mann*,[49] has held that jurors can rely on their professional experience and educational experiences when deliberating, and that the communication of their opinions based upon those experiences does not constitute extrinsic evidence. The New Mexico court expressed concern at trying to distinguish between a juror's opinions and experiences as improper extraneous information and permissible deliberation based on life experiences.[50] The court further noted that any problems related to this issue could be addressed on voir dire. Prospective jurors who expressed that their education or professional background would affect their ability to be unbiased could be removed for cause. Otherwise, such jurors would still be subject to strategic removal through the peremptory challenge process.[51]

---

[44] 729 N.E.2d 701 (N.Y. 2000).

[45] *Id.* at 704-05.

[46] *Id.* at 705.

[47] *Id.*

[48] *Id.*

[49] 39 P.3d 124, 132 (N.M. 2002).

[50] *Id.* at 132-34.

[51] *Id.* at 135.

California has taken an approach that seems to be a middle ground between the *Maragh* and *Mann* cases. In the case of *In re Malone,* the California Supreme Court stated that:

> It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work.[52]

The California High Court stressed, however, that an opinion could not be based on specialized information not admitted into evidence. If the juror introduced information from an outside source, rather than relying on the evidence or testimony elicited during trial, this would constitute misconduct.[53]

Having considered the views expressed by these and other courts,[54] we adopt the approach taken by the New Mexico Supreme

---

[52]911 P.2d 468, 486 (Cal. 1996).

[53]*Id.*

[54]*E.g., State v. Jordan,* 481 P.2d 383, 387-88 (Alaska 1971) (denying new trial where defendant testified regarding trolling spoons, and three fisherman jurors opined, based on their experiences, that scrap metal admitted into evidence resembled parts of homemade trolling spoons because jurors' comments did not inject *extraneous* information into deliberation, but instead relied on personal experiences to evaluate evidence); *State v. Graham,* 422 So. 2d 123, 132 (La. 1982) (discussing difference between information within experience and practical knowledge of all jurors with esoteric or special knowledge pertaining directly to a case); *State v. Coburn,* 724 A.2d 1239, 1241-42 (Me. 1999) (discussing difference between juror knowledge based on juror's life experiences and information received from outside source during jury service); *State v. Lawlor,* 56 P.3d 863, 866-67 (Mont. 2002) (where juror told remaining panel members that defendant must have prior DUI convictions since defendant was charged with felony DUI, court denied new trial because information was considered general knowledge of juror, not extrinsic evidence); *Hankins v. State,* 213 N.W. 344, 347 (Neb. 1927) (denying new trial where juror indicated, based on his experience with cash registers, that the register could not make a mistake because juror was using life experience to evaluate evidence and basis for his beliefs on trial issues); *State v. Aguilar,* 818 P.2d 165, 167 (Ariz. Ct. App. 1991) (denying new trial where juror with medical degree disagreed with defendant's expert's opinion on material issue and conveyed juror's own expert opinion to rest of jury panel because jurors permitted to use own knowledge and experience to deliberate); *State v. Miller,* 1 P.3d 1047, 1050-51 (Or. Ct. App. 2000) (denying new trial where juror employed as prison guard commented on her experiences with prisoners and prison life when evaluating credibility of witnesses because use of previous knowledge and experiences to evaluate evidence is not extrinsic information); *Saenz v. State,* 976 S.W.2d 314, 322-23 (Tex. App. 1998) (denying new trial where jurors with generalized knowledge of firearms discussed their experience with shell ejections in evaluating evidence because information represented

Court in *Mann*. A juror who has specialized knowledge or expertise may convey their opinion based upon such knowledge to fellow jurors. The opinion, even if based upon information not admitted into evidence, is not extrinsic evidence and does not constitute juror misconduct. However, a juror is still prohibited from relating specific information from an outside source, such as quoting from a treatise, textbook, research results, etc.

During voir dire, prospective jurors may be questioned regarding any knowledge or expertise they may have on an issue to be tried and, based upon their responses, may be the subject of peremptory or for cause challenges. Jurors who fail to disclose information or give false information during voir dire commit juror misconduct, which, if discovered after the verdict, may be grounds for a new trial under the standards established for juror misconduct during voir dire as opposed to misconduct that occurs during deliberations.

Turning now to the issue of the nurse's statements regarding hair pulling in this case, we conclude that the juror's statements did not constitute the imposition of specialized knowledge from an outside source. The juror did not refer to any texts, treatises, or other facts in conveying her observations about the source of the scalp bumps. She analyzed the evidence presented in court regarding Catrina's injuries, domestic violence, and Meyer's proffered explanations for the injuries and concluded, based on her professional experience, that such bumps were caused by violence, possibly hair pulling. This is a permissible inference based upon her experience and the evidence. Accordingly, we conclude that the juror did not bring extrinsic evidence into the jury deliberations. Thus, the district court did not abuse its discretion in finding that the juror's actions were not misconduct.

We now address the second instance of alleged misconduct, the independent research, and the introduction of that research to the jury, on the effects of Accutane. A juror told fellow jurors during deliberations that she worked in a dermatologist's office and that Accutane only causes easy bruising in one percent of users. According to the affidavit, she consulted the *Physicians' Desk Reference* (PDR) on the side effects of Accutane during trial and then discussed it with other jurors at the beginning of deliberations. The district court found that this juror's actions constituted juror

generalized knowledge, not specialized expertise, and use of life experiences to evaluate evidence is permissible); *State v. Briggs,* 776 P.2d 1347, 1355-56 (Wash. Ct. App. 1989) (granting new trial where juror's personal knowledge of speech impediments constituted extrinsic evidence not within realm of typical juror's life experience).

misconduct because this was the introduction of extrinsic evidence.[55] We agree.

Jurors are prohibited from conducting an independent investigation and informing other jurors of the results of that investigation.[56] Here, the juror admitted in her affidavit that she consulted the PDR during trial and then reported her findings to fellow jurors during deliberations. Even if she had simply relied on her own memory, this would be outside information beyond the scope of the evidence. This clearly amounted to an extraneous influence upon the jury, and the district court correctly concluded that the second juror's actions constituted misconduct. Having concluded that the PDR incident introduced impermissible extrinsic evidence and constituted independent research, we also conclude that Meyer has established that misconduct occurred.

We now consider whether Meyer established prejudice. To demonstrate prejudice, Meyer must prove that there is a reasonable probability that the PDR reference affected the jury's verdict. Because the misconduct involves extrinsic evidence, the Confrontation Clause is implicated and de novo review of the district court's findings relating to prejudice is appropriate.[57]

Applying some of the factors cited above, we note that the misconduct involved both extrinsic information as well as intrinsic communications (disregard of jury instruction prohibiting independent research). The jury's exposure to the information was brief and it occurred at the beginning of the deliberations. We do not know the length of time it was discussed. However, the side effects of Accutane was a material issue in the case, and the information tended to undermine Meyer's theory that the victim's physical marks were caused by a reaction to medication or falling.

Considering all of the circumstances, we conclude that the average, hypothetical juror could have been affected by this extraneous information, and there is a reasonable probability that the PDR information affected the verdict. Thus, Meyer met his burden of establishing prejudice.

Accordingly, we conclude that the district court erred in denying the motion for a new trial. We therefore reverse the judgment of conviction and remand this matter for a new trial.

---

[55]It is also intrinsic misconduct as the juror disregarded jury instructions prohibiting independent research. Since the affidavit was admissible to show an extraneous influence, it could be considered as well on the issue of intrinsic misconduct.

[56]*See Tanksley,* 113 Nev. at 1002-03, 946 P.2d at 151-52; *see also* NRS 175.121.

[57]*Saya,* 247 F.3d at 937.

ROSE, J., with whom LEAVITT, J., agrees, concurring:

I generally agree with the court's method in determining claims of juror misconduct. However, I would prefer to adopt the California approach when dealing with a juror who has specialized knowledge or training, and I believe that the court should have considered the juror affidavits of improper discussions concerning the possible sentence Meyer might receive.

The jurors improperly discussed the sentence Meyer would receive if convicted of sexual assault. I do not agree with the court's prohibition on scrutinizing intra-jury or intrinsic misconduct when it concerns jurors applying an improper legal standard or jurors considering evidence or facts they were instructed not to consider. Instead, I would apply the same standard in reviewing instances of this type of intrinsic misconduct as we do with extrinsic misconduct.

Jurors are specifically instructed to disregard the sentence to be assessed for any verdict returned, as it is solely the province of the court to assess such punishment.[1] The affidavit of one juror stated that she was the last holdout juror and that another juror advised her not to worry about convicting Meyer because the punishment for sexual assault was only a couple of years. This information, which was apparently accepted as true, was patently false.

Sexual assault is a non-probationable offense that carries a sentence of ten years to life, with a mandatory minimum of ten years in the state penitentiary.[2] Upon receiving this information, the holdout juror changed her mind, resulting in a guilty verdict of sexual assault. I consider this misinformation on the law, given in violation of the jury instructions, to be every bit as harmful as consulting a reference book about the effects of a medication. Thus, I conclude that the penalty discussion constituted intra-jury misconduct that also could justify a new trial.[3]

In prohibiting a district court from considering any intra-jury misconduct presented in a juror affidavit, the court logically concludes that intra-jury misconduct will rarely justify a new trial. Certainly, the district court will not be aware of many instances of jury misconduct if it is unable to consider the jurors'· statements or discussions in the jury room. As in this case, the court holds that information about sentencing was improperly contained in a juror's affidavit. But what if the jurors all acknowledge that they returned a first-degree murder conviction primarily because they believed the mandatory sentence was five years instead of twenty years; or

---

[1]Here, Jury Instruction No. 9 instructed the jurors not to consider the penalty in arriving at a verdict.

[2]*See* NRS 200.366(2)(b).

[3]*See U.S. v. Keating,* 147 F.3d 895, 902 (9th Cir. 1998) (noting that ''intrajury communications may constitute prejudicial extrinsic evidence sufficient to require a new trial'').

if the jurors admitted that they considered "beyond a reasonable doubt" to be the same as "a preponderance of the evidence," and returned a conviction on that faulty basis.

There are some instances of intrinsic juror misconduct that should be considered in a juror's affidavit even without extrinsic influences being involved, but the rule that the court adopts prevents the consideration of this type of misconduct, even though it can be every bit as harmful as extrinsic misconduct, and effectively denies a defendant a fair trial. I would not limit this court's ability to review juror misconduct simply because it involves only intra-jury activity.

I concur in the reversal of Meyer's conviction, with only the reservations as expressed.

MAUPIN, J., concurring:

I agree that the juror affidavits concerning outside juror research from the *Physicians' Desk Reference* (PDR) and discussion of the research with the juror's colleagues established a reasonable probability that the research materials affected the verdict, thus mandating reversal for a new trial.

I write separately to note that our embrace of the New Mexico approach to claims of juror misconduct based upon consideration of extrinsic evidence will substantially and beneficially reduce the scope of post-trial attacks upon jury verdicts.

The New Mexico approach, set forth in *State v. Mann*,[1] allows jurors to consider their specialized knowledge and to communicate views based upon that knowledge. This approach holds that the communication of such views does not constitute the transmission of extrinsic evidence, but does prohibit reliance upon or discussion of information from outside sources such as treatises, textbooks or research not in evidence. Thus, the New Mexico method will eliminate the vast majority of post-verdict relitigation of cases based upon claims of misconduct through reliance on extrinsic evidence where, as here, a juror is possessed of specialized knowledge that may bear on an issue in the case. Also, the New Mexico approach implicitly acknowledges the policy that parties that leave such jurors in place during jury selection take their chances with the use of the specialized knowledge. However, I remain of the view that a doctor, lawyer, engineer or any other person with particularized special knowledge that is relevant to the case is subject to a challenge for cause.

I therefore agree that the specialized knowledge concerning Accutane imparted to the jury does not require reversal. However, I conclude with the majority the PDR research constituted

---

[1]39 P.3d 124, 131 (N.M. 2002).

extrinsic research prohibited under the New Mexico approach. Accordingly, in my view, the use of the PDR research by the jury mandates reversal in this very close case of guilt or innocence.[2]

BECKER, J., with whom SHEARING, J., and YOUNG, Sr. J., agree, concurring in part and dissenting in part:

I concur in the court's adoption of the reasonable probability test for determining when juror misconduct warrants a new trial. I also concur in the court's adoption of the New Mexico standard concluding that expert or quasi-expert opinions given by a juror during deliberations are not misconduct. I dissent, however, from the court's conclusions that Meyer established a reasonable probability that the introduction of the PDR materials regarding Accutane affected the jury's verdict and that a new trial is warranted.

In my opinion, the court places too much emphasis on the inclusion of the PDR materials in the deliberation. While it did tend to undermine Meyer's theory that Catrina's bruises or bumps could have been side effects of Accutane use, other admissible evidence already cast doubts on this contention. The PDR reference was, in part, cumulative of other evidence at trial; namely, experts indicated Accutane was not responsible for the bruises visible on Catrina's body when the police arrived and/or when the sexual assault evaluation was performed. The jury carefully considered the evidence as demonstrated by the questions to the district court on at least two occasions during deliberations and its ultimate decision to convict Meyer of sexual assault and acquit him of kidnapping.

The fractured verdict suggests that the jury carefully delineated between the offenses and undertook its duties with care and diligence.[1] The fractured verdict does not, as suggested by Meyer, indicate the jurors had reservations about the prosecution's case as a whole; there was substantially less evidence to support the kidnapping charge than the sexual assault charge. Thus, even if the jury accepted all of the State's evidence regarding kidnapping, the jury could still conclude that the State had not met its burden of proving kidnapping beyond a reasonable doubt. The same cannot be said of the sexual assault charge.

The evidence of Meyer's guilt as to sexual assault was substantial. In particular, Catrina's boyfriend testified that Meyer called

[2]I also agree that the portions of juror affidavits concerning sentence of necessity involved intrinsic matter and were properly excluded from the district court's consideration of the juror misconduct claims.

[1]See U.S. v. Lloyd, 269 F.3d 228, 241 (3d Cir. 2001) (length of jury's deliberations and the structure of the verdict are relevant to determining the likelihood of prejudice).

him and told him that he was digitally penetrating Catrina's anus as it occurred. The boyfriend could hear Catrina pleading for Meyer to stop. A police officer testified that Catrina told him shortly after the alleged incident that Meyer had digitally penetrated her anus without her consent. Additionally, the officer testified to seeing Catrina's emotional state and various bruises on her person.

Although Meyer testified that the incident was consensual, and his expert characterized Catrina's recantation as consistent with an alcohol blackout, a sexual assault nurse testified that Catrina's anal injuries were consistent with sexual assault. Additionally, the State offered an explanation via expert testimony on Battered Woman Syndrome for Catrina's recantation of her initial allegation of sexual assault.

In addition, while Meyer attempted to attribute some of Catrina's bruises to the side effects of Accutane, he conceded that many of her injuries could not be explained by the medication. As to these other injuries, Meyer's experts testified that falls, acne, or minor blunt force trauma could have caused the injuries. Thus, the importance of the PDR reference diminishes when compared to the other significant injuries Catrina sustained. Finally, none of Meyer's experts attributed Catrina's bruising to Accutane. The only evidence admitted to support this theory was Catrina's statements. In contrast, the State produced expert testimony indicating that the bruising was not caused by minor injuries or side effects of Accutane.

Moreover, the jury's finding of guilt suggests that it rejected Meyer's expert testimony on all of the issues, not just the side effects of Accutane. In light of the totality of the State's evidence that the jury must have accepted as true to sustain a verdict of guilty, and the relatively minor role the bruises played in comparison to Catrina's other injuries, I conclude Meyer did not demonstrate that there was a reasonable probability that the misconduct contributed to the verdict, and the district court did not err in denying the motion for a new trial. I would affirm the conviction.